UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| D.K., by her Guardian L.K.; Z.O., by her Guardian B.M.; and B.R., by her Guardian C.R.,<br><br>          Plaintiffs,<br><br>  -against-<br><br>TIFFANY TEAMS; SHARNELL TUCKER; DEANA LINTON; LASHONDA CONNER; SANDRA GOODWIN; DAPHNE MCKELVEY; JOHN/JANE DOE NOS. 1-10; ELIZABETH GONZALEZ; SHEILA LINDER; JONATHAN PEYTON; JENNIFER TOTI; JOYCE WHITE; KEVIN MORLEY; SHERYL MINTER-BROOKS; and KERRY A. DELANEY,<br><br>          Defendants. | **COMPLAINT AND JURY DEMAND** |

Plaintiffs D.K., by her Guardian L.K.; Z.O., by her Guardian B.M.; and B.R., by her Guardian C.R., as and for their Complaint allege as follows:

### PEOPLE TREATED WORSE THAN ANIMALS

1.      Today, on Union Avenue in the Bronx, New York State runs a sadistic group home where its employees perpetrate unspeakable physical and psychological abuse on severely disabled individuals. *See* Ex. A (a few photos of injuries to disabled residents).

2.      Staff call this place the "Bronx Zoo," but animals in the Bronx Zoo are treated much better. Its real name is the Union Avenue IRA.

3.      For years, according to the State's own investigation, state employees gave disabled residents black eyes, punched them, pulled their hair, spit in their faces, shoved them, punched them, kicked them, smashed their heads into walls, withheld food from them,

1

showered them in cold water, falsified documents about their medical care, gave them the wrong medications, and subjected them to other horrific abuse and neglect.

4.      The staff also operated like a street gang, branding workers who reported the abuse or tried to intervene as "snitches" and intimidating them into silence.

5.      The State of New York, through its Office for People with Developmental Disabilities ("OPWDD"), is supposed to protect and care for disabled people.  But the State turned a blind eye.  State employees continued their abuse of the most vulnerable, innocent, and helpless among us, and no one did anything to stop it.

6.      In 2014, concerned about the alarming frequency with which their loved ones were suffering mysterious bruises and other injuries, Plaintiffs demanded an investigation. For months, the State did virtually nothing.

7.      Even after a whistleblower sent state officials a letter detailing abuse at the Union Avenue IRA, it took weeks before anyone was removed from the home.  In the meantime, the abusers remained responsible for the residents' care and continued abusing them.

8.      This is not a case of one bad apple—the whole tree is rotten to the core. This action seeks injunctive relief and damages for abuse and violations of the rights of the disabled residents of the Union Avenue IRA under state and federal law.

## JURISDICTION AND VENUE

9.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, various federal statutes, and New York State common law.

10.     This Court has subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs' claims arise under the laws of the United States, namely 42 U.S.C. § 1983, the Rehabilitation Act, the Americans

with Disabilities Act, and the Fair Housing Act, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

11.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs' claims arose in this judicial district.

## THE PARTIES

13.     D.K. is a 47-year-old citizen of the United States.  She has resided at the Union Avenue IRA in Bronx County, New York since approximately 1992.  D.K. has been diagnosed to be within the profound range of intellectual delays, and is non-verbal.

14.     L.K. is D.K.'s sister and legal guardian.  She is a citizen of the United States and a resident of Bronx County, New York.

15.     Z.O.  is a 48-year-old citizen of the United States.  She has resided at the Union Avenue IRA in Bronx County, New York since the 1990s.  Z.O. has been diagnosed with an intellectual functioning disability, impulse control disorder, and autism.  She is non-verbal.

16.     B.M. is Z.O.'s sister and legal guardian.  She is a citizen of the United States and a resident of Bronx County, New York.

17.     B.R. is a 35-year-old citizen of the United States.  She has resided at the Union Avenue IRA in the Bronx since approximately 2001.  B.R. has been diagnosed with autism and moderate mental retardation.  She is non-verbal.

18.     C.R. is B.R.'s father and legal guardian.  He is a citizen of the United States and a resident of New York County, New York.

19.    Defendant Tiffany Teams was at all relevant times an employee of OPWDD assigned to work as a Direct Support Assistant at the Union Avenue IRA.  Upon information and belief, Defendant Teams has worked for OPWDD since 2003.

20.    Defendant Sharnell Tucker was at all relevant times an employee of OPWDD assigned to work as a Direct Support Assistant at the Union Avenue IRA.  Upon information and belief, Defendant Tucker has worked for OPWDD since 2007.

21.    Defendant Deana Linton was at all relevant times an employee of OPWDD assigned to work as a Direct Support Assistant at the Union Avenue IRA.  Upon information and belief, Defendant Linton has worked for OPWDD since 2003.

22.    Defendant Lashonda Conner was at all relevant times an employee of OPWDD assigned to work as a Developmental Assistant 1 at the Union Avenue IRA.  Upon information and belief, Defendant Conner has worked for OPWDD since 2000.

23.    Defendant Sandra Goodwin was at all relevant times an employee of OPWDD assigned to work as a Developmental Assistant 1 at the Union Avenue IRA.  Upon information and belief, Defendant Goodwin has worked for OPWDD since 2007.

24.    Defendant Daphne McKelvey was at all relevant times an employee of OPWDD assigned to work as a Direct Support Assistant at the Union Avenue IRA.

25.    Defendants John/Jane Doe Nos. 1 through 5 were at all relevant times employees of OPWDD assigned to work with residents at the Union Avenue IRA.  Each of them abused and/or neglected D.K., Z.O., and/or B.R.  They are sued under fictitious designations because Plaintiffs have not been able to ascertain their names, notwithstanding reasonable efforts to do so.

26.    Defendants John/Jane Doe Nos. 6 through 10 were at all relevant times employees of OPWDD assigned to supervise other staff working with residents at the Union Avenue IRA.  Each of them failed to intervene to prevent abuse and neglect of D.K., Z.O., and/or B.R. despite having a reasonable opportunity to do so and/or acted with deliberate indifference to the health, safety, and well-being of D.K., Z.O., and/or B.R. in a manner constituting a substantial departure from accepted professional judgment, practice, or standards.  They are sued under fictitious designations because Plaintiffs have not been able to ascertain their names, notwithstanding reasonable efforts to do so.

27.    Defendant Elizabeth Gonzalez was at all relevant times an employee of OPWDD assigned to work as a Developmental Assistant 1 at the Union Avenue IRA and to supervise other staff at the Union Avenue IRA.

28.    Defendant Sheila Linder was at all relevant times an employee of OPWDD assigned to work as a Developmental Assistant 2 at the Union Avenue IRA and to manage and supervise other staff at the Union Avenue IRA.  Upon information and belief, Defendant Linder has worked for OPWDD since 2000.

29.    Defendant Jonathan Peyton was at all relevant times an employee of OPWDD assigned to work as a Social Worker Assistant 3 at the Union Avenue IRA and to manage and supervise other staff at the Union Avenue IRA.  Upon information and belief, Defendant Peyton has worked for OPWDD since 1989.

30.    Defendant Jennifer Toti was at all relevant times an employee of OPWDD assigned to work as a Treatment Team Leader at the Union Avenue IRA, supervising other workers at the facility.  Defendant Toti has been a high-level supervisor of Union Avenue IRA staff since at least 2011.

31.    Defendants Teams, Tucker, Linton, Conner, Goodwin, and McKelvey, along with John/Jane Doe Nos. 1 through 5, are referred to collectively herein as the "Staff Defendants."

32.    Defendants Gonzalez, Linder, Peyton, and Toti, along with John/Jane Doe Nos. 6 through 10, are referred to collectively herein as the "Supervisor Defendants."

33.    Defendant Joyce White is the Deputy Director of the Metro New York Developmental Disabilities State Operations ("DDSO") Office.  In this position, Defendant White is responsible for development and monitoring of OPWDD systems improvement (including quality improvement and plans of corrective action), overseeing the provision of services to developmentally disabled people (including through regular review of clinical and other records), managing recordkeeping, and promoting best practices in OPWDD facilities in the Bronx and Manhattan, including the Union Avenue IRA.

34.    Defendant Kevin Morley is the Director of Residential Services and Director of Operations for the Metro New York DDSO Office and is currently the senior OPWDD administrator stationed at the Union Avenue IRA.  In this position, Defendant Morley oversees group homes for disabled adults throughout the Bronx, including the Union Avenue IRA.  Defendant Morley supervises all of the clinicians and direct support professionals working with residents at the Union Avenue IRA.  He is also responsible for overseeing and directing investigations of abuse, neglect, and mistreatment.

35.    Sheryl Minter-Brooks is the Region 5 Director of OPWDD.  In this position, Defendant Minter-Brooks is responsible for development and monitoring of OPWDD systems improvement (including quality improvement and plans of corrective action), overseeing the provision of services to developmentally disabled people (including through regular review

of clinical and other records), managing recordkeeping, and promoting best practices in OPWDD facilities in New York City, including the Union Avenue IRA.

36.    Kerry A. Delaney is Acting Commissioner of OPWDD.  In this position, she is responsible for developing, implementing, and overseeing OPWDD policies and practices throughout New York State, including at the Union Avenue IRA.  These responsibilities include coordinating services for more than 128,000 New Yorkers with developmental disabilities. OPWDD provides services both directly and through other agencies.

37.    Defendants White, Morley, Minter-Brooks, and Delaney are referred to collectively herein as the "OPWDD Defendants."

38.    At all times relevant hereto, and in all relevant respects, each and every one of the Defendants acted under color of state law and within the scope of their employment as employees of the State of New York.

39.    Each and every one of the Staff Defendants and the Supervisor Defendants is sued in his or her individual capacity only.

40.    Defendants White, Minter-Brooks, and Morley are sued in their individual and official capacities.

41.     Defendant Delaney is sued in her official capacity only.  Only equitable relief is sought against her.

## JURY DEMAND

42.    Plaintiffs demand trial by jury in this action.

## FACTS

### D.K., Z.O., and B.R. Come to Live at the Union Avenue IRA

43.    D.K. has been developmentally disabled since she was approximately 18 months old, when a series of seizures left her profoundly impaired.

7

44.    D.K. was first placed in a residential facility at around age 10.  Since then, she has lived in a variety of residential settings around New York State.  She has resided at the Union Avenue IRA since the early 1990s.

45.    Z.O. has been profoundly disabled for all of her life.  While she initially lived at home for a number of years, she required residential care as she grew into adolescence and required increased supervision.

46.    Z.O. has lived at the Union Avenue IRA since the late 1990s.

47.    B.R. began to show signs of developmental disability at around age 2.  She entered her first group home at around age 9.

48.    B.R. moved into the Union Avenue IRA in approximately 2001, when she aged out of a previous group home that served only residents aged 21 or younger.

***Early Signs of Ongoing Abuse and Neglect at the Union Avenue IRA***

49.    Although it was not until the summer of 2014 that the staggering pervasiveness and severity of abuse and neglect at the Union Avenue IRA was definitely and dramatically uncovered, there had been clues that something was amiss for years.

**D.K.**

50.    D.K.'s family's first hint about problems with D.K.'s care at the Union Avenue IRA came in September of 2004, when D.K., who is legally incompetent to consent to sexual activity, tested positive for trichomoniasis, a sexually transmitted disease.

51.    Although D.K.'s family met with OPWDD personnel and the Bronx District Attorney's Office about the incident, no action was ever taken.  OPWDD claimed that D.K. had contracted trichomoniasis at a sleepaway camp she had attended, most likely from a foreign exchange student who had already left the jurisdiction.

52.    In more recent years, D.K.'s family began to notice unexplained bruises and other injuries on D.K.'s body.  They also began to notice that D.K. did not want to return to the IRA after weekend visits to the family home in the Bronx.

**Z.O.**

53.    B.M. also long harbored concerns that Z.O. was being mistreated at the Union Avenue IRA.

54.    Beginning in approximately 2011, B.M. began to notice that Z.O. often trembled and cried for no apparent reasons.  Her legs appeared swollen, and bruises would sporadically appear on her hands and arms.

55.    At around the same time, B.M. noticed that staff began reacting with hostility to B.M.'s visits, even though B.M. had been visiting Z.O. at the facility for years without incident.

56.    When B.M. pointed out Z.O.'s bruises, she was stonewalled.  Often, staff simply told her "I don't know" when asked about the origin of Z.O.'s injuries.  Staff members often laughed at B.M. and mocked her attempts to ensure Z.O.'s safety.

57.    In 2013 and 2014, Z.O. was taken to the hospital for unexplained or inadequately explained injuries at least a dozen times.

58.    In one instance, on or about October 19, 2013, Z.O. was rushed to the emergency room with a laceration on her mouth that required six stitches to close.

59.    OPWDD claimed the injuries were caused by a fall.

**B.R.**

60.    In or around July 2011, C.R. received a phone call from a Union Avenue IRA staff member who informed him that a staff member had pulled B.R.'s hair because B.R.

was taking a nap on a couch that staff wanted to use. The staff member told C.R. that abuse of residents by staff at the Union Avenue IRA was widespread.

61.     C.R. reported this information to an Acting Deputy Director at OPWDD.

62.     In response, Defendant Toti was charged with overseeing an investigation of systemic abuse at the Union Avenue IRA. Defendant Toti met with staff members including Defendants Gonzalez, McKelvey, Teams, Linder, Linton, and Tucker, all of whom denied that abuse was occurring.

63.     According to her report of the 2011 inquiry, Defendant Toti "met with staff on each floor of Union Ave IRA to apprise them of the situation and to remind them that abuse of our individuals will not be tolerated." Upon information and belief, not a single staff member was disciplined or removed from contact with residents as a result of Defendant Toti's "investigation."

64.     In the ensuing years, B.R. sustained a slew of mysterious injuries at the Union Avenue IRA.

65.     For instance, on April 18, 2014, C.R. visited B.R. and found that she was bleeding from a cut on her lip.

66.     Staff first said the injury was a cold sore, then said she had sustained the injury at a day program earlier that day. C.R. called B.R.'s day program and was told she did not cut her lip there.

67.     C.R. asked Union Avenue IRA staff for the facility's written report on B.R.'s injury. He was told, in sum and substance, that "if it is a small thing, we don't make a report."

10

68.     On April 23, 2014, B.R. sustained a bleeding laceration on the inside of her left ear.  Again, the injury was unexplained.

***Summer 2014: A Summer of Black Eyes***

69.     In a span of three months from May to August 2014, D.K., Z.O., and B.R. were all treated at hospitals for black eyes.

**B.R.'s Black Eye**

70.     On May 17, 2014, B.R. woke up with a blue and purple bruise under her left eye.

71.     Defendant Gonzalez was the supervisor on duty.  She informed C.R. that afternoon that B.R. had been taken to the Emergency Room due to a "discoloration" under her eye.  When C.R. asked Gonzalez what had caused the discoloration, Gonzalez stated, in sum and substance, "We don't know.  She woke up that way."

72.     Gonzalez told C.R. that B.R. had been examined by a doctor who said the injury was "not bad."  But C.R. called Lincoln Hospital and was informed that B.R. had been there but had not been seen by a doctor.  Hospital staff explained that B.R. "went home" before being seen.

73.     On May 27, 2014, Defendant Toti called C.R. and explained that B.R.'s injury had been "upgraded" to an allegation of physical abuse.  Toti explained that B.R. had been punched in the face by an OPWDD employee in front of witnesses.

74.     Investigators found that B.R. had been punched by a staff member, but could not determine who hit her due to witnesses' inconsistent stories and recantations.

75.     Upon information and belief, after Union Avenue IRA supervisors determined that B.R. had been punched, no further action was taken to protect B.R. or other residents from the perpetrator.

**D.K.'s Black Eye**

76.     On August 5, 2014, L.K. was contacted by Defendant Peyton, who informed her that the skin around D.K.'s eyes was discolored.  Defendant Peyton attributed the discoloration to "allergies," suggesting that perhaps D.K. had been rubbing her eye out of discomfort.

77.     After this initial phone call, L.K. received messages at home and on her cell phone indicating that the "allergy" claim was false and that D.K.'s eye injury actually appeared to have been caused by an assault.

78.     L.K. rushed to Lincoln Hospital, where D.K. had been taken for evaluation and treatment.

79.     When she arrived at D.K.'s bedside, L.K. could immediately tell that D.K. had a black eye.

80.     Hospital staff informed L.K. that D.K.'s escort from the Union Avenue IRA, Defendant McKelvey, had abused D.K. in the hospital while waiting with her to be seen by medical personnel.

81.     According to an internal hospital report, Defendant McKelvey spoke to D.K. in a verbally aggressive manner and "violently pushed the patient."  Hospital staff reported the incident to Defendants Peyton and Linder.

82.     After interviewing a number of witnesses, state investigators later determined that Defendant McKelvey had abused and neglected D.K. at Lincoln Hospital.

83.     Months later, state authorities determined after a belated investigation that D.K.'s black eye had been caused by Defendant Tucker, who punched D.K. in the back and pushed her against a bathroom wall at the Union Avenue IRA.

84.    According to investigative findings, Defendant Tucker's vicious assault of D.K. occurred on July 29, 2014—a full week before D.K. was provided with medical attention.

85.    Defendant Tucker continued to work at the Union Avenue IRA, with responsibility for caring for disabled residents, for more than six weeks after punching D.K.

**Z.O.'s Black Eye**

86.    On August 15, 2014, Z.O. also sustained an unexplained black eye.

87.    Z.O. was taken to the hospital, where she was treated and observed for approximately 13 hours.

88.    State investigators later learned that a Union Avenue IRA staff member had witnessed Defendant Tucker push Z.O. in the shower that day.  Defendant Tucker had then "pointed out" the mark on Z.O.'s eye.

*A Whistleblower Reports Rampant Abuse to Defendant White, Who Does Nothing*

89.    Finally, in August 2014, the long-simmering suspicions of rampant abuse at the Union Avenue IRA reached a rolling boil.

90.    On August 20, 2014, a staff member at the Union Avenue IRA wrote an anonymous letter to Defendant White detailing the abuse of disabled residents by OPWDD staff.[1]

91.    The letter explained that Union Avenue IRA staff—including Defendants Tucker, Teams, Linton, Linder, Conner, and Goodwin—"abused and beat consumers" openly at the Union Avenue IRA.

92.    The letter stated that Defendants Peyton and Linder "covers [sic] up every and anything that goes on" at the facility and "are fully aware of the abuse and even know who the abusers are."

---

[1] We now know the name of the staff member.

93.    The letter stated that Defendant Linton had punched B.R. in the face and given her a black eye.  According to the letter, Union Avenue IRA staff member Nicole Gibson "was there including myself but was too afraid to confess it was Deena Linton."  The letter claimed that Linton intimidated other staff members into blaming the incident on another staff member, Kimkisha Ryer.

94.    The anonymous whistleblower wrote that he or she "personally reported" Defendant Linton's behavior to Defendants Peyton and Linder and "was told it would be taken care of," but "nothing was done."

95.    The letter stated that Defendant Linder frequently invited a former staff member, Donald Jackson, to spend time at the Union Avenue IRA, despite the fact that Jackson had been banned from the Union Avenue IRA for physically abusing residents.  The letter stated that "**ALL** of the staff sees him comes [sic] and no one turns him away."

96.    The letter stated that Defendant Linder, despite acknowledging that Jackson had "bust[ed]" a disabled resident's eardrum, had left Jackson alone with residents while running errands.

97.    The letter also stated that Defendant Peyton had seen Jackson at the Union Avenue IRA and had given him a high-five and smoked a cigarette with him instead of directing him to leave.

98.    The letter stated that the black eye for which D.K. had been treated at the hospital on August 5, 2014 "came from Sharnell Tucker punching her in the back and her face hit the wall."

99.    The letter stated that Defendant Teams had pulled D.K.'s hair and "spit directly in her face."

14

100. The letter stated that Defendant Teams denied food to residents.

101. The letter stated that Union IRA staff member Uvalin Thorpe-Binns hit a resident in the head, causing an injury that required staples. According to the letter, Defendant Linder "instructed her not to come to work the next day to cover it up."

102. The letter stated that Binns had slapped another resident in the face.

103. The letter stated that Union IRA staff member Michael Johnson "beats on" two residents and "stresses how much he dislikes them."

104. The letter stated that Johnson punched one resident in the stomach.

105. The letter stated that Defendant Peyton "drinks on the job" and "comes to work drunk."

106. The letter stated that Defendants Goodman, Conner, and Linder hit, kicked, and punched B.R. The letter stated that these three non-disabled, State-employed adult caregivers "don't like" B.R.—a disabled resident in their care who has the intellectual functioning of a toddler—"because she shows off in front of her dad and drinks from everybody['s] cups and bottles."

107. The letter stated that Defendant Conner kicked Z.O. "in the legs to the point where they swelled up like balloons."

108. The letter stated that another Union Avenue IRA staff member, Suzie Soto, abused a resident by slapping him in the back of his head and neck. The letter stated that Ms. Soto "laughs hard about it."

109. The anonymous whistleblower wrote that he or she "reported every incident and was told not to listen to what I was taught in training class because it would label me as a snitch and that I should keep my mouth shut."

110.    The letter concluded: "I truly hope and pray that these consumers get the justice that they deserve and the staff be arrested for their actions towards these consumers. I hold you Ms. Joyce White responsible for getting these people of God Justice. May God have mercy on your soul. I did my part as a trainee; I think it is in order for you to **DO YOURS**."

111.    Upon information and belief, neither Defendant White nor any other OPWDD administrator took any action in response to the letter for more than three weeks.

***Abuse Continues After OPWDD Fails to React to the Whistleblower's Letter***

112.    OPWDD's utter apathy and indifference to the allegations of abuse allowed the harm to residents to continue in the weeks following August 20, 2014.

113.    For instance, on August 27, 2014, D.K. was taken to Lincoln Hospital for injuries to her right knee and lip. Staff claimed D.K. sustained the injuries when she fell in the shower.

114.    When L.K. arrived at the hospital to see D.K. after her alleged fall in the shower, D.K.'s hair was not wet.

115.    An internal investigation later found that "the bathroom floor was very slippery" and had caused multiple falls. The investigation also found that Defendants Teams and Tucker had used a detached showerhead "like a hose while showering the service recipients" in what investigators called "assembly line showering" practices. Investigators found that Defendants Teams and Tucker engaged in these practices "on a regular basis."

116.    On September 1, 2014, nearly two weeks after the whistleblower's letter to Defendant White, Z.O. sustained numerous bruises and swelling to her legs.

117.    State investigators later determined that Z.O.'s injuries were the result of being kicked repeatedly by Defendant Conner.

16

118.    Investigators noted that the whistleblower "had already written the anonymous letter to Deputy Director Joyce White and no action was taken to protect the individuals at Union Ave."

**The Whistleblower Reports Abuse Directly to L.K., B.M., and C.R.**

119.    On or about September 12, 2014, L.K., B.M., and C.R. received letters directly from the same whistleblower who had written to Defendant White weeks earlier.

120.    The anonymous writer expressed dismay that despite his or her previous letter to Defendant White, "these people are still there working" and "still abusing" residents.

121.    The September letters repeated and expanded upon many of the allegations in the August letter sent to Defendant White.

122.    For example, the letter to L.K. stated that Defendants Teams and Tucker "make [D.K.] sit in a corner behind a chair away from everyone else" and denied her food.

123.    L.K.'s letter stated that Defendant Tucker was responsible for D.K.'s black eye.

124.    L.K.'s letter stated that D.K. and other residents "are being severely abused" and that Defendants Peyton and Linder "are aware of the abuse and covers [sic] it up."

125.    B.M.'s letter explained that Z.O.'s black eye "came from Sharnell Tucker who is still there working with her."

126.    B.M.'s letter stated that "Lashonda Conner beats on [Z.O.] also and kicks her."

127.    B.M.'s letter stated that Defendant Goodwin "covered up [Z.O.] being cut in the toe by Tiffany Teams and Sharnell Tucker."

128. B.M.'s letter stated that "Sheila Linder and Jonathan Peyton cover[] up everything that goes on in there."

129. C.R.'s letter stated that Defendants Goodwin, Teams, and Linton punched B.R.

130. C.R.'s letter stated that Defendant Linton was responsible for B.R.'s May 2014 black eye.

131. The letters repeated that Defendant Peyton was frequently drunk at work.

132. The letters also stated that Defendant Linder was sexually abusing residents.

133. The whistleblower apologized for not doing more to help, explaining that s/he feared for his or her life.

**The State's Belated Investigation Confirms Staggering and Sustained Abuse**

134. Upon receiving their letters, L.K., B.M., and C.R. demanded a thorough and prompt investigation.

135. OPWDD finally responded. The staff members named in the whistleblower's letters were placed on administrative leave and removed from contact with residents.

136. Shortly after being placed on administrative leave, Defendants Teams and Conner gathered with Ms. Soto for what they called "Happy Hour for the Accused" and posted photographs of themselves enjoying their paid leave on social media.

137. The State's investigation, led by the Justice Center, eventually reached an array of shocking conclusions.

138.     The investigation found that between February 2014 and August 2014, Defendant Teams pulled D.K.'s hair and spit on her face.

139.     The investigation confirmed that on July 29, 2014, Defendant Tucker punched D.K. in the back and pushed her against a bathroom wall.

140.     The investigation confirmed that Defendant McKelvey grabbed D.K. and forcibly sat her in a seat and spoke to her abusively during the August 5, 2014 hospital visit.

141.     The investigation determined that Defendants Teams and Tucker would order Z.O. and B.R. to wait nude on their beds to be showered "and that they would comply out of fear." The investigation also confirmed that Defendants Teams and Tucker used cold water to bathe D.K. and Z.O.

142.     As described above, the investigation determined that Defendant Tucker had given Z.O. a black eye on August 15, 2014 by pushing her in the shower.

143.     As described above, the investigation determined that Defendant Conner "repeatedly struck and/or kicked" Z.O. "throughout the day" on September 1, 2014, causing bruising and swelling to Z.O.'s legs.

144.     The investigation found that Z.O. had numerous injuries of unknown origin between April 1, 2014 and October 2, 2014. The investigation found that Z.O. had a steady stream of bruises and lacerations that staff "consistently blamed" on "a blood disorder, self-abusive behavior, clumsiness, day program staff, and transportation staff." The investigation found that Z.O.'s self-injurious behavior could not explain her many injuries, and that her "mildly low platelet count is not enough to cause the bruising" she suffered.

145.     The investigation found that Defendant Linder taught and encouraged another disabled Union Avenue IRA resident to call Z.O. a bitch.

19

146.    The investigation found that Defendants Linder, Conner, and Goodwin openly disliked B.R. and spoke derisively about her at the facility.

147.    As described above, the investigation confirmed that a staff member had punched B.R. in the face on May 16, 2014, causing her black eye.  The investigation was inconclusive as to the identity of the staff member responsible.

148.    Investigators probing B.R.'s black eye learned that a Union Avenue IRA staff member named Watince Wilkerson had reported hearing from her co-worker Nicole Gibson that Gibson had personally seen staff member Kimkisha Ryer punch B.R. in the face because B.R. had coughed while Ryer was trying to administer her medication.

149.    Wilkerson said she had reported what she heard to Defendant Gonzalez, her supervisor.  Defendant Gonzalez told Wilkerson not to worry and that "nothing more was going to happen."

150.    Defendant Gonzalez subsequently admitted to state investigators that she had directed that B.R. be brought back from the emergency room without seeing a doctor because the hospital was busy.  She also admitted that she had not reported the abuse when she first heard about it because there were "so many stories," and had instead told staff who tried to report the incident that she didn't want to "hear any more about [B.R.'s] eye."

151.    Wilkerson then reported the incident to Defendants Peyton and Linder. They, in turn, summoned Ms. Gibson, who had allegedly witnessed the incident.

152.    According to Defendant Peyton, Gibson confirmed that Ryer had punched B.R.  However, according to Defendant Peyton, Gibson refused to complete a written statement, claiming she feared "possible reprisals and repercussions."

153.    When interviewed by state investigators, Defendant Linder described the meeting as a hostile verbal confrontation between Wilkerson and Gibson.  Linder claimed the exchange was inconclusive as to whether Gibson had actually seen Ryer punch B.R.  When confronted with the fact that Defendant Peyton had told investigators that Gibson verbally admitted seeing Ryer punch B.R. but refused to sign a statement out of fear, Defendant Linder said "the noise from the arguing was too loud and that she did not hear anything."

154.    In a later interview with state investigators, Gibson denied having any knowledge of the origin of B.R.'s black eye.

155.    The investigation also found that Defendants Tucker and Teams withheld food from D.K., Z.O., and B.R.  The investigation found that Tucker and Teams failed to feed residents and threw away their food as punishment.  Defendants Tucker and Teams denied residents, including D.K., Z.O., and B.R., their scheduled evening snacks on a frequent basis "because they do not deserve it."

156.    The investigation found that Defendant Teams stole "large amounts of agency food" and took it home from the Union Avenue IRA.  Staff reported seeing Defendant Teams "going into the pantry and then taking a black garbage bag of unknown items" to her car, after which food that had just been delivered was found missing.  Supervisors confirmed that there was a "problem with missing food" at the facility.

157.    The investigation also found that nurses and medical personnel at the Union Avenue IRA medically neglected D.K., Z.O., and B.R.

158.    Medical staff repeatedly failed to schedule medically indicated doctor's appointments for D.K., Z.O., and B.R., including appointments with neurologists, gynecologists, ENT specialists, and dentists.

159. Medical staff failed to ensure B.R.'s blood was tested to monitor the levels of several psychotropic drugs prescribed to her. Over a year after being notified that the required blood draws had not been completed and "needed to be followed closely," medical staff still had not administered the test.

160. Medical staff did not properly dispose of expired and/or non-administered medications. For example, they administered a skin cream to B.R. that had been expired for four months. They also assigned medication to Z.O. that had previously belonged to another resident.

161. Medical personnel were found to have falsified documents related to D.K.'s and Z.O.'s medical care.

162. The investigation also found numerous systemic concerns with treatment of residents at the Union Avenue IRA.

163. For example, the investigation found that "Human Resources and Quality Management at Metro DDSO were unable to provide documentation" concerning Donald Jackson's disciplinary history "and appeared to be unaware of its existence." As a result, no one enforced the prohibition on Jackson's presence at the Union Avenue IRA after he was found to have abused residents there. Jackson repeatedly visited the facility without consequence.

164. The investigation further found that Z.O.'s frequent injuries were not properly documented. Certain staff failed to complete required checks of Z.O.'s body, and there were "bruises on one shift that would not be documented on the following shift, or bruises that were documented as old for several weeks in a row."

165. The investigation found that "supervisory follow up" on Z.O.'s many unexplained injuries "did not occur. As a result, without verification and follow-up, the agency failed to pinpoint the origin" of the cuts and bruises. According to the investigation, "[t]here

were no systems in place to safeguard Z.O. and she continued to have suspicious bruising and other injuries until the staff persons named in the anonymous letter had been placed on Administrative Leave."

166. The State investigation found based on interviews with Union Avenue IRA staff and supervisors, including Defendants Peyton and Toti, that body checks of residents "are not routinely reviewed or monitored by supervisory staff," and "did not occur on a consistent basis." Investigators found that, as a result of inadequate training and supervision, "staff are under the impression that as long as a bruise was documented on the body check form, no formal notification to management or nursing was required regardless of the severity or suspicion surrounding the injury."

167. The investigation also found that staff were not properly trained to handle residents' behaviors. For example, investigators found that several challenging behaviors were not described at all in D.K.'s Behavior Plan or her Individual Plan of Protection—signed by Defendant Toti—and concluded that "there is no direction to staff on how to address these behaviors." In the absence of training, frustrated staff simply resorted to abuse.

168. Similarly, while D.K.'s Behavior Plan noted her "PICA" behaviors— persistent ingestion of nonnutritive substances—investigators found that "there is no clear direction for staff on how to manage her environment in order to maintain her safety."

169. The Union Avenue IRA run by New York State was operated without proper training, supervision, or quality control systems. Staff were at best unqualified and poorly trained and at worst sadistic and barbarous. Yet they were given virtually total control over the lives of profoundly vulnerable disabled group home residents.

170. Unspeakable abuse and neglect was the predictable result.

## DAMAGES AND CONTINUING THREAT OF INJURY

171.    As a direct and proximate result of the Defendants' actions, Plaintiffs suffered severe physical and emotional injury.

172.    The Defendants' acts were reckless, willful, wanton, and malicious, thus entitling Plaintiffs to an award of punitive damages.

173.    D.K., Z.O., and B.R. continue to reside at the Union Avenue IRA.  Their families have considered alternate placements, but have faced difficulty finding appropriate residences sufficiently near to their homes that could provide the appropriate level of care for D.K., Z.O., and B.R.  Financial and insurance concerns further complicate matters, and in-home care is prohibitively expensive.

174.    Defendant White's inaction in response to the August 20, 2014 letter is part of a pronounced pattern of deliberate indifference on the part of the OPWDD Defendants concerning abuse, neglect, and mistreatment at the Union Avenue IRA.

175.    Defendants Minter-Brooks and Morley have received numerous complaints about abuse, neglect, and mistreatment at the Union Avenue IRA over a period of several years and have responded in a manner evincing deliberate indifference to the strong likelihood that the federally protected rights of Plaintiffs and other residents were being violated.

176.    Even since L.K., B.M., and C.R. received their anonymous letters in September 2014 and OPWDD responded by removing a number of the accused abusers from the home, the OPWDD Defendants have otherwise remained lackadaisical.

177.    For example, Defendant Morley has frequently failed to respond to guardians' telephone calls and emails requesting information about incidents in which Plaintiffs have been injured under suspicious circumstances at the Union Avenue IRA.

178. The OPWDD Defendants have failed to ensure compliance by OPWDD and the Union Avenue IRA with the requirements of Jonathan's Law, New York State's statutory regime entitling legal guardians to all medical records and abuse investigation records. Requests for such records by L.K., B.M., and C.R. have in some cases been ignored for months before records were belatedly provided; in other cases, L.K., B.M. and C.R. have not been provided mandatory notifications at all.

179. On or about March 16, 2015, Defendant Minter-Brooks received a letter from OPWDD Deputy Commission Megan O'Connor-Hebert notifying her that the Metro New York DDSO Office was being placed on Early Alert—a status that denotes serious deficiencies on the part of a local agency.

180. The letter stated that the Metro New York DDSO Office "has been unable to sustain compliance with applicable laws and regulations" and had received "a total of eight 45 day letters"—letters issued by OPWDD Division of Quality Improvement inspectors noting serious and persistent concerns with agency operations—in the year between March 2014 and March 2015.

181. The letter further stated that "OPWDD has a number of concerns with your agency and the lack of compliance" in eight areas: medical follow-up, medication administration, protective oversight, community inclusion, habilitative services, physical plant, staff training, and incident management.

182. D.K., Z.O., and B.R. face a real and immediate threat of future injury from abuse and neglect. Violations of federal law at the Union Avenue IRA similar to those hereinbefore alleged are continuing and pose a likelihood of substantial harm to D.K., Z.O., B.R., and other residents.

25

183. For example, D.K., Z.O., and B.R. all recently sustained unexplained head wounds within a period of approximately one month.

184. On or about February 12, 2016, a body check revealed that B.R. had a gash in her scalp. She was taken to the Emergency Room at Montefiore Hospital for treatment.

185. Although no one could explain how B.R. had sustained the injury, Union Avenue IRA personnel insisted it was not their fault.

186. Next, on or about February, 23, 2016, Z.O. was taken to the Emergency Room at Montefiore Hospital for treatment of a laceration to her head.

187. Union Avenue IRA supervisors could not explain the origin of the injury and admitted that it was the result of staff misconduct.

188. B.M. continues to notice mysterious bruises on Z.O.'s body.

189. On or about March 9, 2016, D.K. also suffered a gash on her head while at the Union Avenue IRA.

190. D.K.'s injury, too, was unexplained.

191. In general, injuries to residents continue to be regular occurrences at the Union Avenue IRA.

192. For example, upon information and belief, the week of February 22, 2016, another resident was taken to the Emergency Room three separate times for serious and suspicious injuries, including head trauma and severe lacerations.

193. Improper staff conduct also remains rampant at the Union Avenue IRA.

194. For instance, upon information and belief, on February 9, 2016, a Union Avenue IRA staff member came to work intoxicated and menaced residents and other staff members, yelling profanities.

195.    The culture of whitewashing and intimidation likewise persist at the Union Avenue IRA.

196.    For example, on or about March 6, 2016, B.M. visited Z.O. at the Union Avenue IRA. She noticed that Z.O.'s eye appeared red and droopy. B.M. asked a Union Avenue IRA staff member what had happened to Z.O.'s eye. The staff member responded that she did not know because her shift had just begun. The staff member and B.M. then asked a supervisor what had happened to Z.O.'s eye, and the supervisor responded that Z.O. had no documented injuries and that Z.O. was just teary-eyed.

197.    After satisfying herself that Z.O. did not require additional medical treatment, B.M. continued her visit with Z.O.

198.    About an hour into the visit, B.M. noticed that Z.O. had wet her diaper. B.M. took Z.O. upstairs to find the workers responsible for Z.O.'s care so that Z.O.'s diaper could be changed.

199.    By happenstance, B.M. walked in on a gathering between the supervisor with whom she had spoken about Z.O.'s eye earlier and several other Union Avenue IRA staff members. B.M. heard the supervisor telling the other staff members, in sum and substance, that residents' family members are known to "accuse" staff members of abuse and neglect. The supervisor said she would not tolerate such accusations and told the staff members, in sum and substance, "I'm here to protect you."

200.    When the supervisor saw B.M. entering nearby, she stopped speaking.

201.    B.M. asked the supervisor whether she had been referring to B.M. in her speech to the other workers. In front of other staff members, the supervisor responded that she had been referring to B.M. and attempted to justify her statements by castigating B.M. for

"making accusations" against Union Avenue IRA staff.

202.    The supervisor crossed the room to stand right next to B.M. and insisted that Z.O. was no longer being abused.  The supervisor told B.M., in sum and substance: "the past is the past, and you have to get over it."

203.    On or about March 8, 2016, B.M. called the Union Avenue IRA to report the supervisor's inappropriate conduct and statements to a manager.

204.    The person who took her call answered the telephone with the words: "Good morning, Bronx Zoo."

### FIRST CAUSE OF ACTION
**42 U.S.C. § 1983, Fourth Amendment**
**(Against the Staff Defendants, the Supervisor Defendants, and Defendant White in Their Individual Capacities)**

205.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

206.    By reason of the foregoing, using excessive force, assaulting Plaintiffs, confining them, imprisoning them, seizing them, sadistically assaulting them, brutally battering them, and failing to stop such ongoing abuse by others in their presence, the Staff Defendants and Defendant Linder deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

207.    The Supervisor Defendants created and/or allowed to continue the custom and de facto policy of widespread abuse and neglect of residents at the Union Avenue IRA, causing the violation of Plaintiffs' Fourth Amendment rights.

208.    The Supervisor Defendants were grossly negligent in managing

28

subordinates who caused the violation of Plaintiffs' Fourth Amendment Rights.

209.    The Supervisor Defendants and Defendant White exhibited deliberate indifference to Plaintiffs' rights by failing to act on information indicating that they were being abused and neglected at the Union Avenue IRA in violation of their Fourth Amendment rights.

210.    The Supervisor Defendants and Defendant White failed to remedy the violation of Plaintiffs' Fourth Amendment rights even after learning of widespread abuse and neglect through numerous reports, including without limitation Defendant Toti's 2011 inquiries concerning abuse of B.R. and other residents, reports made to Defendants Gonzalez, Peyton, and Linder concerning abuse of B.R. in May 2014, and the anonymous letter sent to Defendant White in August 2014.

211.    In addition, the Staff Defendants and Supervisor Defendants conspired among themselves to deprive Plaintiffs of their constitutional rights secured by the Fourth Amendment to the United States Constitution, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

212.    The Staff Defendants, the Supervisor Defendants, and Defendant White acted under pretense and color of state law and in their individual capacities and within the scope of their respective employments as state officers.  Said acts by these Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and the Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their clearly established constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth Amendment of the United States Constitution.

213.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983, Fourteenth Amendment
### (Against the Supervisor Defendants and Defendant White in their Individual Capacities)

214. Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

215. The Supervisor Defendants and Defendant White knew or should have known that the pattern of abuse and neglect against residents described above existed at the Union Avenue IRA. Upon information and belief, the abuse and neglect was carried out openly and notoriously, and no person reasonably carrying out these Defendants' duties with respect to the Union Avenue IRA could have failed to apprehend the grave risks to Plaintiffs' safety, health, and well-being posed by rampant abuse and neglect at the facility.

216. The Supervisor Defendants received repeated reports of abuse and neglect at the facility over a period of several years, and in some instances participated in inadequate and/or ineffectual investigations of such abuse and neglect, but failed to take reasonable steps to stop it.

217. Defendant White received an anonymous letter from a Union Avenue IRA staff member on August 20, 2014 reporting widespread abuse and neglect at the Union Avenue IRA, but failed to take any steps to remedy the situation for weeks.

218. The Supervisor Defendants and Defendant White created or allowed the continuance of the custom by which this unlawful treatment was carried out. Their failure to take measures to curb this pattern of abuse and neglect constituted acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the residents in their care and custody, including Plaintiffs, and amounted to a substantial departure from accepted professional judgment, practice, and standards.

219.    The acts and omissions of the Supervisor Defendants and of Defendant White were a substantial factor in the continuation of such abuse and neglect and a proximate cause of the constitutional violations alleged in this complaint and of Plaintiffs' resultant damages, hereinbefore alleged.

220.    The Supervisor Defendants and Defendant White acted under pretense and color of state law and in their individual capacities and within the scope of their respective employments as state officers.  Said acts by these Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and the Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their clearly established constitutional rights secured by the Fourteenth Amendment of the United States Constitution.

### THIRD CAUSE OF ACTION
**Assault**
**(Against the Staff Defendants and Defendant Linder in Their Individual Capacities)**

221.    Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

222.    As set forth above, the Staff Defendants and Defendant Linder willfully and maliciously assaulted Plaintiffs in that they had the real or apparent ability to cause imminent harmful and/or offensive bodily contact and intentionally did violent and/or menacing acts which threatened such contact to Plaintiffs.  Such act(s) caused the apprehension of such contact in Plaintiffs.

223.    All this occurred without any fault or provocation on the part of Plaintiffs.

224.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages herein alleged.

## FOURTH CAUSE OF ACTION
### Battery
**(Against the Staff Defendants and Defendant Linder in Their Individual Capacities)**

225.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

226.    As set forth above, the Staff Defendants and Defendant Linder willfully and maliciously battered Plaintiffs in that they deliberately touched Plaintiffs and/or caused Plaintiffs to be touched, and such physical contact was offensive, unwelcome, and without consent.

227.    All this occurred without any fault or provocation on the part of Plaintiffs.

228.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages herein alleged.

## FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
**(Against the Staff Defendants and Defendant Linder in Their Individual Capacities)**

229.    Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

230.    As set forth above, the Staff Defendants' actions, and those of Defendant Linder, were extreme and outrageous.

231.    The Staff Defendants' actions, and those of Defendant Linder, were undertaken with the intent to cause Plaintiffs severe emotional distress and/or were done in disregard of a substantial probability of causing severe emotional distress.

232.    As a result of the Staff Defendants' actions, and those of Defendant Linder, Plaintiffs suffered extreme and severe emotional distress.

233.    As a result of the malicious and intentional infliction of emotional distress

32

by the Staff Defendants and by Defendant Linder, Plaintiffs suffered damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**Negligence**
**(Against the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks in Their Individual Capacities)**

234.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

235.    The Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks owed a duty of care to Plaintiffs as residents of the Union Avenue IRA.

236.    The Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks breached the duty of care that they owed to Plaintiffs by allowing them to be abused and neglected through their negligent hiring, supervision, training, discipline, and retention of staff at the Union Avenue IRA.

237.    This breach of the duty of care was the proximate cause of Plaintiffs' serious and unnecessary injuries as hereinbefore described.

238.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

**SEVENTH CAUSE OF ACTION**
**New York State Human Rights Law**
**(Against the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks in Their Individual Capacities)**

239.    Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

240.    At all times relevant hereto, the Union Avenue IRA was a "housing

accommodation" as defined by N.Y. Executive Law § 292(10) and a "publicly-assisted housing accommodation" as defined by N.Y. Executive Law § 292(11).

241.    At all times relevant hereto, the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks were agents and/or employees of the Union Avenue IRA's owner, lessee, sub-lessee, assignee, and/or managing agent, and/or were agents and/or employees of some other person having the right to sell, rent, or lease a housing accommodation.

242.    Plaintiffs are disabled within the meaning of the New York State Human Rights Law.

243.    The acts and omissions of the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks as hereinbefore described, including without limitation failing to provide Plaintiffs with necessary and proper care and supervision, abusing and neglecting Plaintiffs, failing to detect and remedy the abuse and neglect of Plaintiffs, and failing to properly supervise one another, constituted discrimination against Plaintiffs because of disability in the furnishing of facilities or services in connection with Plaintiffs' occupancy at the Union Avenue IRA, and/or aided, abetted, incited, compelled, and/or coerced said discrimination.

244.    As a direct and proximate result of this discrimination, Plaintiffs sustained the damages hereinbefore alleged.

### EIGHTH CAUSE OF ACTION
**New York City Human Rights Law**
**(Against the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks in Their Individual Capacities)**

245.    Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

246. At all times relevant hereto, the Union Avenue IRA was a housing accommodation and publicly-assisted housing accommodation.

247. At all times relevant hereto, the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks were agents and/or employees of the Union Avenue IRA's owner, lessor, lessee, sublessee, assignee, and/or managing agent, and/or were agents and/or employees of some other person having the right to sell, rent, or lease a housing accommodation, or an interest therein.

248. Plaintiffs are disabled within the meaning of the New York City Human Rights Law.

249. The acts and omissions of the Staff Defendants, the Supervisor Defendants, and Defendant White as hereinbefore described, including without limitation failing to provide Plaintiffs with necessary and proper care and supervision, abusing and neglecting Plaintiffs, failing to detect and remedy the abuse and neglect of Plaintiffs, and failing to properly supervise one another, constituted discrimination against Plaintiffs because of disability in the furnishing of facilities or services in connection with Plaintiffs' occupancy at the Union Avenue IRA, and/or aided, abetted, incited, compelled, and/or coerced said discrimination.

250. As a direct and proximate result of this discrimination, Plaintiffs sustained the damages hereinbefore alleged.

### NINTH CAUSE OF ACTION
**Fair Housing Act**
**(Against the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks in Their Individual Capacities and Against the OPWDD Defendants in their Official Capacities for Injunctive Relief)**

251.    Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

252.    Defendants' conduct as hereinbefore described discriminates in the provision of services or facilities in connection with a dwelling because of disability, in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

253.    Plaintiffs are aggrieved persons as defined by 42 U.S.C. § 3602(i).

254.    The unlawful discrimination carried out by the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks was intentional, willful, and done in reckless disregard for the rights of others, entitling Plaintiffs to actual damages, punitive damages, and injunctive relief.

255.    Plaintiffs will suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit the OPWDD Defendants' continuing violations of law.

### TENTH CAUSE OF ACTION
**Section 504 of the Rehabilitation Act**
**(Against the OPWDD Defendants in their Official Capacities)**

256.    Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

257.    At all times material to this action, OPWDD and the Metro New York DDSO Office received federal financial assistance to operate programs and activities through and at the Union Avenue IRA.

258.    Plaintiffs are otherwise qualified individuals with disabilities.

36

259. Upon information and belief, the OPWDD Defendants, in their official capacities, are responsible, including without limitation pursuant to 28 C.F.R. § 42.504, for honoring the State's and OPWDD's assurances to the federal government that OPWDD programs and activities conducted by, through, and at the Union Avenue IRA are conducted in compliance with Section 504 of the Rehabilitation Act, and for remedying any non-compliance with such assurances and/or with Section 504.

260. The OPWDD Defendants, acting in their official capacities, have discriminated against Plaintiffs by reason of their disability in violation of the Rehabilitation Act and have failed to ensure that the services, programs, and activities of the Metro New York DDSO Office and the Union Avenue IRA comply with the Rehabilitation Act by failing to ensure that Plaintiffs were provided with the necessary and proper care and supervision; failing to properly supervise one another, the Supervisor Defendants, and the Staff Defendants, and failing to detect and remedy the abuse and neglect of Plaintiffs.

261. As a direct and proximate result of the deliberate indifference of Defendants White, Morley, and Minter-Brooks detailed above, Plaintiffs sustained damages as herein alleged.

262. Plaintiffs will suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit the OPWDD Defendants' continuing violations of law.

### ELEVENTH CAUSE OF ACTION
**Title II of the Americans with Disabilities Act**
**(Against the OPWDD Defendants in their Official Capacities)**

263. Plaintiffs repeat and reallege the foregoing as if the same were fully set forth at length herein.

264. At all times material to this action, OPWDD and the Metro New York

37

DDSO Office were public entities that operated services, programs, and/or activities through and at the Union Avenue IRA.

265.    Plaintiffs are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12132.

266.    Upon information and belief, the OPWDD Defendants, in their official capacities, are responsible for ensuring that services, programs, and activities conducted by, through, and at the Union Avenue IRA comply with Title II the Americans with Disabilities Act, and for remedying any non-compliance.

267.    Acting in their official capacities, the OPWDD Defendants have denied Plaintiffs the benefits of the services, programs, or activities of OPWDD and the Metro New York DDSO Office and have subjected Plaintiffs to discrimination by failing to ensure that Plaintiffs were provided with the necessary and proper care and supervision; failing to properly supervise one another, the Supervisor Defendants, and the Staff Defendants; and failing to detect and remedy the abuse and neglect of Plaintiffs.

268.    Plaintiffs will suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit these continuing violations of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against defendants as follows:

1.    awarding compensatory damages against the Staff Defendants, the Supervisor Defendants, Defendant White, Defendant Morley, and Defendant Minter-Brooks in their individual capacities in an amount to be determined at trial;

2.    awarding compensatory damages against Defendant White, Defendant Morley, and Defendant Minter-Brooks in their official capacities pursuant to Section 504 of the Rehabilitation Act;

3.    awarding punitive damages in an amount to be determined at trial;

4.    enjoining the OPWDD Defendants from violating Plaintiffs' rights under federal law;

5.    awarding Plaintiffs reasonable attorneys' fees and costs under  28 U.S.C. § 2412, 42 U.S.C. § 1988, 29 U.S.C. § 794a, 42 U.S.C. § 3613(c), 42 U.S.C. § 12133, New York Executive Law § 297(10), and New York City Administrative Code § 8-502(g); and

6.    directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:  May 2, 2016
        New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP


_____/s/_____
Ilann M. Maazel
David A. Lebowitz
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiffs*
