------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  7-5-17

D.K., by her guardian L.K.; Z.O., by her guardian B.M.;
and B.R., by her guardian C.R.,

                               Plaintiffs,

                    -v-

TIFFANY TEAMS, SHARNELL TUCKER, DEANA
LINTON, LASHONDA CONNER, SANDRA
GOODWIN, DAPHNE MCKELVEY, JOHN/JANE
DOES NOS. 1–10, ELIZABETH GONZALEZ, SHEILA
LINDER, JONATHAN PEYTON, JOYCE WHITE,
CHERYL MINTER-BROOKS, and KERRY A.
DELANEY,

                               Defendants.

16 Civ. 3246 (PAE)

OPINION & ORDER

------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

Plaintiffs here are three people with developmental disabilities, each of whom is non-verbal, and each of whom has lived for many years at the "Union Avenue IRA," a Bronx facility operated by the New York State Office for People with Developmental Disabilities ("OPWDD"). These plaintiffs—D.K., by her guardian L.K., Z.O., by her guardian B.M., and B.R., by her guardian C.R.—claim that their rights were violated in connection with allegedly deficient care and years of physical abuse at the Union Avenue IRA. They bring this action against staff workers at the Union Avenue IRA and their supervisors under 42 U.S.C. § 1983; § 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*; the Fair Housing Act, 42 U.S.C. § 3604(f)(2), and state law.

Defendants Tiffany Teams, Sharnell Tucker, Lashonda Conner, Daphne McKelvey, Elizabeth Gonzalez, Sheila Linder, Jonathan Peyton, Cheryl Minter-Brooks, and Kerry A.

Delaney now move to dismiss under Federal Rules of Civil Procedure 12(b) and 12(c). They argue that sovereign immunity deprives the Court of jurisdiction under Rule 12(b)(1); that plaintiffs fail to state claims under Rule 12(b)(6); and, as to defendants Conner and Linder, who answered the complaint rather than moving to dismiss, that they are entitled to judgment on the pleadings under Rule 12(c).

For the following reasons, the Court denies the motions to dismiss, while narrowing the scope of plaintiffs' § 1983 claims to eliminate a theory of conspiracy liability.

## I.  Background

### A.  Factual Allegations[1]

#### 1.  The Developmentally Disabled Plaintiffs

D.K., Z.O., and B.R. are individuals with developmental disabilities who reside at a facility known as the "Union Avenue IRA"[2] in the Bronx, which is operated by OPWDD. AC ¶¶ 2, 13–18. Each plaintiff is "non-verbal" and has been seriously disabled either her entire life or since 18 to 24 months of age. *Id.* ¶¶ 41–46. As of October 26, 2016, when the AC was filed, D.K. was 47 years old and had resided at the Union Avenue IRA since 1992; Z.O. was 48 years old and had resided at the Union Avenue IRA since the late 1990s; and B.R. was 35 years old and has resided at the Union Avenue IRA since around 2001. *Id.* ¶¶ 13, 15, 17, 41–46. This lawsuit is brought by legal guardians on behalf of each plaintiff; L.K. is D.K.'s sister, B.M. is Z.O.'s sister, and C.R. is B.R.'s father. *Id.* ¶¶ 14, 16, 18.

---

[1] The following summary of plaintiffs' factual allegations is drawn from the Amended Complaint ("AC"). Dkt. 130.

[2] "IRA" is an abbreviation for "Individualized Residential Alternative," a type of facility that OPWDD describes on its website as a community residence providing room and board, individualized service options, and 24-hour staff support and supervision.

## 2. Defendants' Positions and Responsibilities

Defendants were employed by OPWDD in various capacities. The AC sorts them into three groups. The "Staff Defendants" group consists of Teams, Tucker, Linton, Conner, Goodwin, and McKelvey, plus John/Jane Does Nos. 1–5. *Id.* ¶ 30. Teams, Tucker, Linton, and McKelvey were employed as Direct Support Assistants at the Union Avenue IRA, *id.* ¶¶ 19–21, 24; Conner and Goodwin were each employed as a Developmental Assistant 1 at the Union Avenue IRA, *id.* ¶¶ 22–23.

The "Supervisor Defendants" group consists of Gonzalez, Linder, and Peyton, plus John/Jane Does Nos. 6–10. *Id.* ¶ 31. At the Union Avenue IRA, Gonzalez was employed as a Developmental Assistant 1, with responsibility to supervise other staff, *id.* ¶ 27, Linder was employed as a Developmental Assistant 2, with responsibility to manage and supervise other staff, *id.* ¶ 28, and Peyton was employed as a Social Worker Assistant 3, with responsibility to manage and supervise other staff, *id.* ¶ 29.

Finally, the "OPWDD Defendants" group consists of White, Minter-Brooks, and Delaney. *Id.* ¶ 35. White was the Deputy Director of the Metro New York Developmental Disabilities State Operations ("DDSO") Office, with responsibility for development and monitoring of OPWDD systems improvement, overseeing the provision of services to developmentally disabled people, recordkeeping, and promoting best practices at OPWDD facilities in the Bronx and Manhattan, including at the Union Avenue IRA. *Id.* ¶ 32. Minter-Brooks was the Region 5 Director of OPWDD, with responsibility for development and monitoring of OPWDD systems improvement, overseeing the provision of services to developmentally disabled people, recordkeeping, and promoting best practices at OPWDD facilities in New York City, including the Union Avenue IRA. *Id.* ¶ 33. Delaney was the Acting

Commissioner of OPWDD, responsible for developing, implementing, and overseeing OPWDD policies and practices throughout New York State, including at the Union Avenue IRA. *Id.* ¶ 34.

### 3. The Initial Reports and Evidence of Abuse of Plaintiffs

In or before 2011, plaintiffs' families started to suspect that plaintiffs were suffering mistreatment at the Union Avenue IRA. They noticed unexplained bruises, lacerations, and other injuries on each plaintiff. *See, e.g.*, *id.* ¶¶ 48–50 (D.K.), 52–56 (Z.O.), 58–66 (B.R.). For example, in July 2011, C.R. was called by a Union Avenue IRA staff member and notified that "a staff member had pulled B.R.'s hair because B.R. was taking a nap on a couch that staff wanted to use"; in that call, "[t]he staff member told C.R. that abuse of residents by staff at the Union Avenue IRA was widespread." *Id.* ¶ 58. After C.R. reported this information to an OPWDD Acting Deputy Director, a Union Avenue IRA supervisor conducted an investigation, met with staff at the Union Avenue IRA, and issued a report to the staff, "to apprise them of the situation and to remind them that abuse of our individuals will not be tolerated." No staff member was disciplined as a result of the supervisor's investigation. *Id.* ¶¶ 60–61.

In summer 2014, D.K., Z.O., and B.R. were each treated at a hospital for black eyes. *Id.* ¶ 67. On May 17, 2014, B.R. woke up with a blue and purple bruise under her left eye. *Id.* ¶ 68. Gonzalez was the supervisor on duty at the time; she informed C.R. that B.R. had been taken to the emergency room of Lincoln Hospital after having awakened that day with the black eye and that B.R. had been examined by a doctor at the hospital. *Id.* ¶ 69. Hospital staff, however, later explained to C.R. that B.R. had been sent home before being seen by a doctor. *Id.* ¶ 70. Later, on May 27, 2014, a different supervisor called C.R. and explained that B.R.'s injury had been "upgraded" to an allegation of physical abuse. The supervisor "explained that B.R. had been punched in the face by an OPWDD employee in front of witnesses." *Id.* ¶ 71. Investigators

later determined that B.R. had been punched by a staff member, although they could not determine who hit her because the witnesses' stories and recantations were in conflict. *Id.* ¶ 72.

On August 5, 2014, Peyton contacted L.K. to inform her that D.K.'s eyes were discolored, explaining that the discoloration had been caused by "allergies" and that D.K. had possibly been rubbing her eyes out of discomfort. *Id.* ¶ 74. After Peyton's phone call, however, L.K. received messages at her home and on her cell phone indicating that the claim that the eye discoloration was caused by "allergies" was false and that D.K.'s eye injury had been caused by an assault. *Id.* ¶ 75. L.K. then traveled to Lincoln Hospital, where D.K. had been taken for treatment; upon seeing D.K., L.K. "could immediately tell that D.K. had a black eye." *Id.* ¶¶ 76–77. In addition, McKelvey had been D.K.'s escort from the Union Avenue IRA to Lincoln Hospital; Lincoln Hospital staff told L.K. that McKelvey had "spoke[n] to D.K. in a verbally abusive manner and 'violently pushed the patient.'" *Id.* ¶¶ 78–79. The hospital staff also reported this incident to Peyton and Linder. *Id.* State investigators investigated this incident and, after interviewing witnesses, determined that McKelvey "had abused and neglected D.K. at Lincoln Hospital." *Id.* ¶ 80. Months later, state authorities determined that D.K.'s black eye had been caused by Tucker, "who punched D.K. in the back and pushed her against a bathroom wall at the Union Avenue IRA" on July 29, 2014, a week before D.K. had been taken to Lincoln Hospital. *Id.* ¶¶ 81–83.

On August 15, 2014, Z.O. also sustained a black eye and was taken to the hospital, where she was treated and observed for roughly 13 hours. *Id.* ¶¶ 84–85. After this incident, state investigators reported "that a Union Avenue IRA staff member had witnessed . . . Tucker push Z.O. in the shower that day. . . . Tucker had then 'pointed out' the mark on Z.O.'s eye." *Id.* ¶ 86.

### 4.     The Whistleblower's August 2014 Letter to White

On August 20, 2014, a staff member at the Union Avenue IRA (the "whistleblower") anonymously sent a letter to White "detailing the abuse of disabled residents by OPWDD staff." *Id.* ¶¶ 88–89.  The letter explained to White that Union Avenue IRA staff, including Tucker, Teams, Linton, Linder, Conner, and Goodwin, "'abused and beat consumers' openly at the Union Avenue IRA," and that "Peyton and Linder 'cover[] up every and anything that goes on' at the facility and 'are fully aware of the abuse and even know who the abusers are.'" *Id.* ¶¶ 90–91.  The letter stated that Linton had punched B.R. in the face, resulting in a black eye, and that the whistleblower, along with another staff member, had observed that incident; however, the whistleblower wrote, he/she and the staff member were "too afraid to confess it was Deena [sic] Linton," and that "Linton [had] intimidated other staff members into blaming the incident on another staff member[.]" *Id.* ¶ 92.  The whistleblower stated that he or she had "personally reported" Linton's behavior to Peyton and Linder and "was told it would be taken care of" but that "nothing was done." *Id.* ¶ 93.  Further, the whistleblower wrote, Linder often invited a former staff member to spend time at the Union Avenue IRA even though this staff member had been banned from the facility for physically abusing residents; the letter stated that "ALL of the staff sees him com[e] and no one turns him away." *Id.* ¶ 94.

The whistleblower's letter detailed instances of abuse by various defendants and lapses by supervisors in supervising staff members and responding to instances of abuse by staff members.  The letter stated that Linder—despite acknowledging that the banned former staff member had "bust[ed]" a disabled resident's eardrum—had left this individual alone with residents at the Union Avenue IRA while Linder ran errands.  *Id.* ¶ 95.  The letter also stated that another staff member had "hit a resident in the head, causing an injury that required staples," and

that Linder had "instructed [the staff member] not to come to work the next day to cover it up." *Id.* ¶ 100.

Among other instances of abuse, the letter described a staff member's punching a resident in the stomach and another's slapping a resident in the face, and reported that Peyton consumed alcohol while working and "comes to work drunk." *Id.* ¶¶ 101–04. The letter also stated that the black eye for which D.K. had been treated at Lincoln Hospital on August 5, 2014 had "c[o]me from Sharnell Tucker punching her in the back and her face hit the wall"; that Teams had "pulled D.K.'s hear and 'spit directly in her face'"; and that Teams had denied food to residents. *Id.* ¶¶ 97–99. The letter stated that Conner had kicked Z.O. "in the legs to the point where they swelled up like balloons." *Id.* ¶ 106. The letter also stated that "Goodman, Conner, and Linder hit, kicked, and punched B.R." *Id.* ¶ 105.[3] As summarized by the AC, the letter stated those three defendants "'don't like' B.R.—a disabled resident in their care who has the intellectual functioning of a toddler—'because she shows off in front of her dad and drinks from everybody['s] cups and bottles.'" *Id.* The letter closed with a plea to White: "I hold you Ms. Joyce White responsible for getting these people of God Justice. May God have mercy on your soul. I did my part as a trainee; I think it is in order for you to DO YOURS." *Id.* ¶ 109. The AC alleges, however, that neither "White nor any other OPWDD administrator took any action in response to the letter for more than three weeks." *Id.* ¶ 110.

### 5. Continued Abuse of Plaintiffs After the Whistleblower's Letter

The AC alleges that abuse at the Union Avenue IRA continued after the whistleblower's letter was received. On August 27, 2014, D.K. was taken to Lincoln Hospital for injuries to her

---

[3] The Court construes the reference to "Defendant Goodman" to refer to defendant Goodwin. The AC sorts Goodwin into the Staff Defendants group; she, like Conner, worked at the Union Avenue IRA as a Developmental Assistant 1. *Id.* ¶¶ 22–23.

right knee and hip, which staff claimed were the result of a fall she sustained in the shower, even though D.K.'s hair was dry when L.K. arrived at the hospital to visit D.K. *Id.* ¶¶ 112–13. An internal investigation determined that the bathroom floor had been very slippery and that Teams and Tucker had used a detached showerhead "like a hose while showering the service recipients" in "assembly line showering" practices, and that Teams and Tucker used this practice regularly. *Id.* ¶ 114. On September 1, 2014, Z.O sustained bruises and swelling to her legs, injuries that state investigators later determined were the result of "being kicked repeatedly by Defendant Conner." *Id.* ¶ 119–20. The investigators also noted that even though "the whistleblower 'had already written the anonymous letter to Deputy Director Joyce White[,] no action was taken to protect the individuals at Union Ave.'" *Id.* ¶ 121.

### 6. The Whistleblower's September 2014 Letters to Plaintiffs' Relatives

On or about September 12, 2014, the same whistleblower sent letters directly to L.K., B.M., and C.R. *Id.* ¶ 122. These letters repeated, and added detail to, many claims in the August 20, 2014 letter to White. *Id.* ¶ 124. As to D.K., the letter sent to L.K. stated that Teams and Tucker make D.K. sit in a corner away from other residents and deny her food, that Tucker was responsible for D.K.'s black eye, and that Peyton and Linder "are aware of the abuse and cover[] it up." *Id.* ¶¶ 125–27. As to Z.O., the letter to B.M. stated that Z.O.'s black eye "came from Sharnell Tucker who is still working there with her," that "Lashonda Conner beats on [Z.O.] also and kicks her," that Goodwin "covered up [Z.O.] being cut in the toe by Tiffany Teams and Sharnell Tucker," that "Sheila Linder and Jonathan Peyton cover[] up everything that goes on in there." *Id.* ¶¶ 128–31. As to B.R., the letter to C.R. stated that Goodwin, Teams, and Linton punched B.R, that Linton was "responsible for B.R.'s May 2014 black eye," and that Peyton was often drunk at work and that Linder was sexually abusing residents. *Id.* ¶¶ 132–35.

### 7. The OPWDD's Investigation and Report on the Abuse Allegations

After receiving these letters, L.K., B.M., and C.R. demanded that OPWDD conduct an investigation. *Id.* ¶ 137. OPWDD began an investigation and placed the staff members named in the whistleblower's letter on administrative leave and removed them from contact with residents. *Id.* ¶ 138. The investigation was led by the New York State Justice Center for the Protection of People with Special Needs. *Id.* ¶ 140.

The investigation, which resulted in a report, found, among other things, the following.

It found that between February 2014 and August 2014, Teams had pulled D.K.'s hair and spat on her face, *id.* ¶ 141; that, on July 29, 2014, Tucker had punched D.K. in the back and pushed her against a bathroom wall, *id.* ¶ 142; that McKelvey had grabbed D.K. and forcibly sat her in a seat and spoke to her in an abusive manner during D.K.'s August 5, 2014 visit to Lincoln Hospital, *id.* ¶ 143; that Teams and Tucker had ordered Z.O. and B.R. to wait naked on their beds to be showered, that Z.O. and B.R. "would comply [with this directive] out of fear," and that Teams and Tucker had used cold water to bathe D.K and Z.O., *id.* ¶ 144; that Tucker had given Z.O. a black eye on August 15, 2014 by pushing her in the shower, *id.* ¶ 145; that, on September 1, 2014, Conner had "repeatedly struck and/or kicked" Z.O. "throughout the day," resulting in bruising and swelling of Z.O.'s legs, *id.* ¶ 146; and that a staff member had punched B.R. in the face on May 16, 2014 because B.R. had coughed while the staff member was trying to administer her medication, causing a black eye, although the investigation could not determine the identity of the staff member responsible, *id.* ¶¶ 151–52.

The investigation also found that Union Avenue IRA staff members had reported the physical abuse to Gonzalez, their supervisor, but that Gonzalez had responded that staff members should not worry and that "nothing more was going to happen." The investigators' report stated

that Gonzalez had admitted to investigators that she had directed that B.R. be brought back to the Union Avenue IRA from the Lincoln Hospital emergency room without seeing a doctor.  *Id.* ¶¶ 152–54.  The report stated that a different staff member, who had heard about B.R.'s having been punched on May 16, 2014, had reported the incident to Peyton and Linder after Gonzalez did not act, and Peyton and Linder summoned a different staff member who apparently had witnessed the punching.  *Id.* ¶ 156.  The report stated that that staff member had confirmed to Peyton that she had punched B.R., but that the staff member had refused to complete a written statement out of fear of potential repercussions.  *Id.* ¶ 157.  The report further stated that Linder, when interviewed, described the meeting with the staff member who had apparently witnessed the punching incident as hostile and argumentative, and as not conclusively establishing that the witness had seen the punching.  The report stated that Linder, when confronted about Peyton's statement to investigators that the witness had reported seeing the punching but refused to put this in writing out of fear of reprisal, stated that "the noise from the arguing was too loud and that she did not hear anything."  *Id.* ¶ 158.

The investigation also found that Tucker and Teams had withheld food from plaintiffs, and that Tucker and Teams did not feed Union Avenue IRA residents and discarded their food as punishment.  *Id.* ¶ 161.  The report also found that Tucker and Teams frequently denied plaintiffs their scheduled evening snacks "because they do not deserve it."  *Id.*

The investigation also found that nurses and other medical personnel at the Union Avenue IRA had medically neglected plaintiffs.  *Id.* ¶ 163.  Lapses included repeatedly failing to schedule medically indicated doctors' appointments, including with neurologists, gynecologists, otolaryngologists, and dentists; failing to administer necessary blood tests to B.R. in connection with psychotropic drugs prescribed to her; administering expired medication to B.R. and

assigning medication to Z.O. that had belonged to another resident; and to have falsified documents related to D.K.'s and Z.O.'s medical care.  *Id.* ¶¶ 163–67.  The investigation found, based on interviews of Union Avenue IRA staff and residents including Peyton, that "body checks of residents 'are not routinely reviewed or monitored by supervisory staff' and 'did not occur on a consistent basis.'"  *Id.* ¶ 172.

### 8.    The 2015 "Early Alert" Notice of Compliance Deficiencies

On or about March 16, 2015, Minter-Brooks received a letter from OPWDD Deputy Commissioner Megan O'Connor-Hebert.  It stated that the Metro New York DDSO Office— overseen by White, Minter-Brooks, and Delaney—was being placed on "Early Alert," meaning that there were serious deficiencies in its operations.  *Id.* ¶ 184.  The letter stated that the Metro New York DDSO Office "'has been unable to sustain compliance with applicable laws and regulations' and had received no fewer than 'eight 45 day letters'—letters issued by OPWDD Division of Quality Improvement inspectors repeatedly noting serious and persistent concerns with agency operations—in the year between March 2014 and March 2015."  *Id.* ¶ 185.  The letter stated that that OPWDD was concerned with the "lack of compliance" in eight areas, including protective oversight, staff training, and incident management.  *Id.* ¶ 186.  As used in the letter, "protective oversight" means "protecting residents . . . from physical abuse and neglect;" "staff training" "includes training staff not to abuse or neglect residents;" and "incident management" means "ensuring that potential abuse and neglect is reported, properly investigated, and if substantiated, that appropriate discipline is given."  *Id.* ¶ 187.  The AC alleges that the OPWDD Division of Quality Assurance, in fact, wrote repeatedly to Minter-

Brooks to advise her, in the words of the AC, "that she was failing in all of these areas necessary to protect D.K., Z.O. and B.R.'s safety." *Id.* ¶ 188.[4]

### 9. The Plaintiffs' February/March 2016 Head Injuries

In 2016, each plaintiff sustained unexplained head wounds within a roughly one-month period. *Id.* ¶ 190. On or about February 12, 2016, an inspection of B.R. revealed a gash in her scalp; she was taken to the emergency room at Montefiore Hospital for treatment. *Id.* ¶ 191. On or about February 23, 2016, Z.O. was taken to the emergency room at Montefiore Hospital for treatment of a laceration to her head; although Union Avenue IRA supervisors could not explain the origin of the injury, they admitted it was the result of staff misconduct. *Id.* ¶¶ 193–94. On or about March 9, 2016, D.K. also suffered a gash on her head at the Union Avenue IRA, an injury that went unexplained. *Id.* ¶¶ 196–97.

### 10. The May 2016 Inspection

On May 17, 2016, state regulators from OPWDD's Division of Quality Improvement inspected the Union Avenue IRA. *Id.* ¶ 212. After the inspection, that division sent Minter-Brooks a letter stating that the inspection had "determined that the facility is not in compliance with New York State regulatory requirements to operate an IRA." *Id.* The results of the inspection, which were given to Minter-Brooks, "identified serious and/or systemic deficiencies" at the facility, "including in the areas of protective oversight, incident management, physical plant, personal allowance management, staff training, behavior management, and habilitation services." *Id.* ¶ 213. The inspectors found that 23 reports of abuse, neglect, or mistreatment had

---

[4] In another allegation of a compliance deficiency, the AC alleges that the OPWDD defendants failed to ensure that the OPWDD and the Union Avenue IRA complied with "Jonathan's Law," a New York statute that entitles legal guardians to all medical records and abuse investigation records. It alleges that requests for records by L.K., B.M., and C.R. were ignored for months or never complied with at all. *Id.* ¶ 183.

been made between September and December 2014 on the floor on which plaintiffs reside in the Union Avenue IRA. *Id.* ¶ 214. And, the inspectors found that the Union Avenue IRA "failed to show that any of the systemic concerns noted during the investigations of these allegations have been addressed." *Id.*

### 11.     The August 2016 Inspection

On August 10, 2016, the OPWDD Division of Quality Improvement's inspectors conducted a return visit to the Union Avenue IRA, to determine whether the facility "had achieved regulatory compliance through the effective implementation of plans of corrective action that had been submitted in response to the May 17, 2016 statement of deficiencies." *Id.* ¶ 216. The inspection found that, as to the floor on which the three plaintiffs reside, "'serious and/or systemic deficiencies remain' in all of the areas cited in the previous inspection." *Id.* ¶ 217. The inspection warned that "[c]ontinued authorization of the program/service cannot be considered until we have verified that identified deficiencies have been corrected, and the agency is operating in compliance with applicable regulations." *Id.* ¶ 218. And, despite the earlier findings of "systemic issues"—involving program services, physical plant maintenance, training, incident management, individuals' rights, policy, insufficient monitoring and documentation, and lack of administrative oversight—the inspectors on the return visit found that nothing had been done "to fix these problems." *Id.* ¶ 219. The August 2016 inspection also found that the Union Avenue IRA's review committee had failed to implement the recommendations stemming from earlier investigations aimed at "prevent[ing] future and similar events of abuse and neglect." *Id.* ¶ 220.

### 12.     Substandard Quality of Care

In light of the above allegations, the plaintiffs allege in the AC that the Union Avenue IRA—managed or overseen by the Supervisor Defendants and the OPWDD Defendants—"has been so brazenly and wantonly mismanaged and incompetently run over a period of several years that it does not even meet New York State's own minimum requirements to provide care to the disabled." *Id.* ¶ 223.

## B. Procedural History

On May 2, 2016, plaintiffs filed an initial Complaint. Dkt. 1. The Court granted several requests for extensions of time by the New York State Attorney General ("NYAG") on behalf of defendants, *see* Dkts. 20–22, 24–26, 36, to enable it to determine whether it could represent the defendants. On August 22, 2016, the NYAG determined that it could not. Dkt. 36.

On August 31, 2016, Peyton and White filed motions to dismiss. Dkts. 50–51, 54–56. On September 1, 2016, McKelvey filed a motion to dismiss. Dkts. 57, 59. On September 14, 2016, Minter-Brooks, Delaney, and Gonzalez filed answers. Dkts. 74–75, 78. On October 9, 2016, Goodwin filed an answer and crossclaim against the other defendants for contribution and indemnification. Dkt. 111. On October 12, 2016, Tucker and Teams filed answers. Dkts. 118, 119. On October 7, 2016, the Court held an initial conference, ordered that limited documentary discovery be provided pending resolution of the motions to dismiss, and set a schedule for the filing of an amended complaint and ensuing motions to dismiss. Dkt. 108.

On October 26, 2016, plaintiffs filed the AC, the operative complaint. Dkt. 130. On November 1, 2016, Linder and Conner filed answers to the AC. Dkts. 134, 136. On November 16, 2016, Teams, Tucker, McKelvey, Gonzalez, Peyton, White, Minter-Brooks, and Delaney, filed motions to dismiss AC, and Conner and Linder filed motions for judgment on the pleadings. These defendants also filed a joint memorandum of law covering common legal

issues. Dkt. 141. Supplemental memoranda of law and various declarations were also filed specific to individual defendants or groups thereof. *See, e.g.*, Dkts. 143, 148, 161, 165, 168, 171, 175, 178, 181. On December 22, 2016, plaintiffs filed a brief in opposition. Dkt. 190. On January 11, 2017, Peyton, Gonzalez, White, Tucker, Teams, Minter-Brooks, Delaney, McKelvey, and Conner filed reply briefs. Dkts. 194, 196–98, 200, 202, 204, 206. On February 27, 2017, Linton filed an answer. Dkt. 222. Although Goodwin filed an answer to the initial complaint, to date, she has not filed an answer or otherwise responsive pleading to the AC.

## II.  Discussion

### A.  Overview of the Motions

Plaintiffs bring 10 claims. The first is under federal law. It is brought under § 1983 against all defendants, except Delaney, and in their individual capacities. It alleges violations of plaintiffs' Fourth or Fourteenth Amendment rights to be free from excessive force, deliberate indifference to abuse, and other misconduct. AC ¶¶ 224–38.

The next six claims are brought under state law, in each case against defendants in their individual capacities. These are for (1) assault, against the Staff Defendants and Linder, *id.* ¶¶ 239–42; (2) battery, against the Staff Defendants and Linder, *id.* ¶¶ 243–46; (3) intentional infliction of emotional distress against the Staff Defendants and Linder, *id.* ¶¶ 247–51; (4) negligence, through the supervision and hiring of staff, against the Supervisor Defendants, White, and Minter-Brooks, *id.* ¶¶ 252–56; (5) violations of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, against the Staff Defendants and Linder, *id.* ¶¶ 257–62; and (6) violations of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.*, against the Staff Defendants and Linder, *id.* ¶¶ 263–68.

The final three claims are under federal statutes other than § 1983: for (1) violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2), against the Staff Defendants and Linder, *id.* ¶¶ 269–72; (2) violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the OPWDD Defendants, *id.* ¶¶ 273–79; and (3) violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, against the OPWDD Defendants, *id.* ¶¶ 280–85. The first of these claims is brought against the charged defendants in their individual capacities; the latter two are brought against the OPWDD Defendants in their official capacities.

As noted, the pending motions are to dismiss under Rules 12(b)(1), 12(b)(6), and 12(c), on various grounds, some global, others made only by individual defendants or groups. The moving defendants globally argue that the Court lacks subject matter jurisdiction over this case because sovereign immunity bars plaintiffs' claims. Individual defendants argue that the AC does not adequately allege the required elements for liability under § 1983 for violations of plaintiffs' constitutional rights or under certain state-law and federal statutory claims; and that they are entitled to qualified immunity.

### B.      Standard of Review—Rules 12(b)(6) and 12(c)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

As for a motion for judgment on the pleadings under Rule 12(c), "[a] motion to dismiss under Rule 12(c) is governed by the same standard as a motion under Rule 12(b)(6)." *In re Ades and Berg Grp. Inv'rs*, 550 F.3d 240, 243 n.4 (2d Cir. 2008) (citation omitted). As such, the district court accepts all allegations in the complaint as true, draws all reasonable inferences in the plaintiff's favor, and properly dismisses the complaint when the allegations in the complaint fail to raise an entitlement to relief above the speculative level. *Id.*

### C. Motions to Dismiss the § 1983 Claims Based on Sovereign Immunity

Defendants first argue that plaintiffs' § 1983 claims are barred by sovereign immunity. They argue that the state is the "real party in interest" and that the Eleventh Amendment thus

bars this suit.[5]  The Court denies that motion, because sovereign immunity does not protect the defendants against plaintiffs' claims.

First, it is well established that state officers may be sued in their individual capacities regardless of whether they were acting in the course of their employment, including under § 1983, which provides damages as the remedy for deprivations of federal rights undertaken under color of state law.  "[S]tate officials, sued in their individual capacities, are 'persons' within the meaning of § 1983.  The Eleventh Amendment does not bar such suits[.]"  *Hafer v. Melo*, 502 U.S. 21, 31 (1991); *see also, e.g.*, *Ford v. Reynolds*, 316 F.3d 351, 356 (2d Cir. 2003) ("[T]he eleventh amendment does not extend to a suit against a state official in his [or her] individual capacity, even when the conduct complained of was carried out in accordance with state law." (alteration in original, quotation omitted)).  As such, plaintiffs' suits against the defendants in their individual capacities are not barred by sovereign immunity.

---

[5] Defendants style this motion as under Rule 12(b)(1), for lack of subject matter jurisdiction. Because the motion is clearly meritless, the Court has no occasion to resolve whether such a motion is properly classified as such as opposed to under Rule 12(b)(6) for failure to state a claim.  As the Second Circuit has noted, there are circumstances in which that classification could matter:  Because the Eleventh Amendment can be understood as a limitation on the federal courts' Article III powers, a motion under Rule 12(b)(1) would appear to place the burden on plaintiff to establish the lack of sovereign immunity "because it is generally a plaintiff's burden to demonstrate subject matter jurisdiction"; in contrast, where sovereign immunity is understood as "akin to an affirmative defense that a state may assert or waive at its discretion, the burden would appear to fall on the defendant [state]."  *See Woods v. Rondout Valley Central School Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006).  The Second Circuit has held that the "entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity."  *Id.*  This approach "is more consistent with the understanding that sovereign immunity [is] an affirmative defense."  *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013).  The Second Circuit has noted, however, that whether sovereign immunity is "a true issue of subject matter jurisdiction" is "an open question in the Supreme Court and the Second Circuit."  *Id.*

Second, to the extent that claims are brought here against a defendant in an official capacity,[6] state officers may properly be sued in that capacity for *prospective* relief under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). When *Ex parte Young* applies, it provides an exception to the Eleventh Amendment's sovereign immunity bar to suit; to determine whether *Ex parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 287–88 (2d Cir. 2003) ("The Eleventh Amendment . . . does not preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law."). Because plaintiffs here seek injunctive relief—a classically prospective remedy—against the OPWDD Defendants in their official capacities, the doctrine of *Ex parte Young* applies.[7]

---

[6] Although the AC at one point states that White and Minter-Brooks are sued under § 1983 in their individual capacities, AC ¶ 224, the AC elsewhere states that they are sued both in their individual and official capacities, *id.* ¶ 38. The AC also alleges that plaintiffs "will suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit these defendants' continuing violations of law," *id.* ¶ 238, and seeks an injunction "enjoining the OPWDD Defendants from violating Plaintiffs' rights under federal law," *id.* ¶ 4 (Prayer for Relief). It is thus clear that White and Minter-Brooks are being sued, in their official capacities, for injunctive relief.

[7] White and Minter-Brooks are also sued in their official capacities for "compensatory damages" for violations of § 504 of the Rehabilitation Act. AC ¶ 2 (Prayer for Relief). They have not moved to dismiss these claims on sovereign immunity grounds. And sovereign immunity would not bar such a claim against them because Congress may condition acceptance of federal funds on a state's waiving of its sovereign immunity, and acceptance of funds by a state in the face of such a condition has been held to constitute a waiver of the state's sovereign immunity in federal court. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686–87 (1999). The Rehabilitation Act contains a "clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity." *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 114 (2d Cir. 2001) (referring to 42 U.S.C. § 2000d-7). And the AC alleges that OPWDD and the Metro New York DDSO Office received federal funds to operate the Union Avenue IRA. SAC ¶ 274. Plaintiffs

The Court therefore holds that no defendant is entitled to protection from this lawsuit on the basis of sovereign immunity.

### D. Motions to Dismiss the § 1983 Claims for Failure to State a Claim

Plaintiffs sue the Staff Defendants, the Supervisor Defendants, White, and Minter-Brooks under § 1983 for allegedly violating their federal rights. The alleged violations included the use of excessive force, assault, battery, abuse and neglect, deliberate indifference to plaintiffs' rights, and civil conspiracy. *See* AC ¶¶ 224–38. The AC alleges that the Staff Defendants directly violated plaintiffs' rights. It also alleges that Gonzalez, Linder, Peyton, White, and Minter-Brooks directly participated in the deprivation of plaintiffs' rights and they are also personally liable for these deprivations on other theories of personal liability recognized under § 1983, as reviewed below. Defendants move to dismiss on the grounds that the AC's factual allegations do not adequately plead deprivations of federal rights by means of excessive force, deliberate indifference, and civil conspiracy.

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws

---

therefore may pursue damages from White and Minter-Brooks in their official capacity under § 504 of the Rehabilitation Act. *See, e.g.*, *Keitt v. New York City*, 882 F. Supp. 2d. 412, 456 (S.D.N.Y. 2011) ("New York State's continued acceptance of federal funds waives its sovereign immunity to these [] Rehabilitation Act claims . . . because there can be no argument that . . . the state's continued acceptance of federal funds was not a knowing relinquishment of its [Eleventh] Amendment immunity."); *Brown v. DeFrank*, No. 06 Civ. 2235 (AJP), 2006 WL 3313821, at *27 (S.D.N.Y. Nov. 15, 2006) (same; collecting cases).

of the United States (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc., v. Brooks*, 436 U.S. 149, 155–56 (1978).[8]

The personal involvement of a defendant sued in his or her individual capacity is a requirement for liability under § 1983; a defendant's supervisory authority is insufficient in itself to create liability under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). "To proximately cause a . . . due process violation . . . a defendant must be personally involved in the violation. A plaintiff may establish such personal involvement by making any one of five showings (the 'Colon factors')." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). These showings are as follows: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information that unconstitutional acts were occurring." *Id.* (quoting *Colon*, 58 F.3d at 873); *see also Paterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983. Personal involvement . . . includes not only direct participation in the alleged violation but also gross negligence in the supervision of

---

[8] It is undisputed that defendants, all of whom were employees of OPWDD, were persons acting under color of state law within the meaning of § 1983.

subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.") (citations omitted)).

The Court elaborates here on the standards governing gross negligence and deliberate indifference, because the AC's theory of liability for defendants other than the Staff Defendants rests, in part, on such grounds.

"'[G]ross negligence' denotes a higher degree of culpability than mere negligence. It is the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). This standard is satisfied when "the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Id.* at 117 (collecting cases). "A plaintiff pursuing a theory of gross negligence must prove that a supervisor's neglect caused his subordinate to violate the plaintiff's rights in order to succeed on her claim." *Id.* (citation omitted).

To establish a defendant's "deliberate indifference" to a violation of law, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind. Until very recently, the law applied the same test for "deliberate indifference" to § 1983 claims based on underlying violations of the Eighth Amendment and the Fourteenth Amendment. The Second Circuit, however, in *Darnell v. Pineiro*, 849 F.3d 17, 33 (2d Cir. 2017), recently revisited this question, in light of the Supreme Court's decision in *Kingsley v. Henrdrickson*, 135 S. Ct. 2466 (2015). In *Darnell*, which issued after briefing on the instant motions was complete, the Second Circuit

held that the formulation of the deliberate indifference standard differs depending on which Amendment the federal right flows from.

Under the Eighth Amendment, a deliberate indifference claim requires that the defendant state official have possessed a reckless state of mind equivalent to the "more exacting *subjective standard* akin to that used in the criminal context . . . requir[ing] proof of . . . subjective awareness" of the constitutional violation. *Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994)) (emphasis added). In contrast, for § 1983 claims arising out of violations of the Fourteenth Amendment, the defendant state official must have acted with *objective* recklessness with respect to the violation. *Darnell*, 849 F.3d at 35. The plaintiff must show only that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety"; the *mens rea* required for a deliberate indifference claim of this nature "is defined objectively." *Id.* This standard for deliberate indifference applies to any underlying violation of the due process clause, such as for maintaining unconstitutional conditions of confinement or failing to protect a person in state custody, "because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment." *Id.* at 33 n.9.

### 1. Plaintiffs' Excessive Force Claims

A person in state custody has a federal right not to be treated with excessive force and "must show only that the force purposely or knowingly used against him [or her] was objectively

unreasonable." *Kingsley*, 135 S. Ct. at 2473.[9]  To be liable, the defendant must have inflicted

force with "a purposeful, a knowing, or possibly a reckless state of mind" because "'liability for

negligently inflicted harm is categorically beneath the threshold of constitutional due process.'"

*Id.* at 2472 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1988)).[10]  However, where

force was inflicted consistent with these standards—*e.g.*, purposefully as opposed to

negligently—whether the force used by the state official was excessive is measured under

objective reasonableness, not according to the defendant's state of mind as to the excessiveness

of the force used.  *Id.*

Courts are not to "mechanically" apply this objective reasonableness standard, because

"objective reasonableness turns on the facts and circumstances of each particular case."  *Id.* at

2473 (citation omitted).  This determination must be made from the perspective of a reasonable

---

[9] The AC pleads its excessive force claims as arising under both the Fourth and Fourteenth
Amendments.  It is undisputed that the institutionalized plaintiffs here may bring § 1983 claims
under both Amendments.  In the context of criminal defendants, however, the Supreme Court has
noted that there is an unresolved doctrinal question as to "whether the Fourth Amendment
continues to provide individuals with protection against the deliberate use of excessive physical
force beyond the point at which arrest ends and pretrial detention begins," *Graham v. Connor*,
490 U.S. 386, 395 n.10 (1989), although the Supreme Court has held that "[i]t is clear . . . that
the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts
to punishment," *id.*; *see also Kingsley*, 135 S. Ct. at 2473–74 (analyzing pretrial detainee's right
against excessive force under Fourteenth Amendment substantive due process).  For convicted
defendants, the Eighth Amendment is the main source of protection against excessive and
unjustified force.  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  Although "Fourth Amendment
claims are tied to reasonableness, which is considerably less demanding" than Fourteenth
Amendment claims, *Dancy v. McGinley*, 843 F.3d 93, 117 (2d Cir. 2016), but the doctrinal issue
appears more academic than consequential in this case, as the Court does not find that any
allegation of misconduct here might state liability under the Fourth Amendment but not under
the Fourteenth Amendment.

[10] In *Kingsley*, the Supreme Court did not decide whether recklessly imposed force, if objectively
unreasonable, could give rise to liability under substantive due process.  It was undisputed in
*Kingsley* that the defendants had purposefully or knowingly used force on the plaintiff.  *Kingsley*,
135 S. Ct. at 2472.

official under the circumstances, and a court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of . . . officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). A court evaluating the objective reasonableness of the force used under the circumstances must assess the relationship between the amount of force used and its furtherance of a legitimate governmental objective, because a person in state custody "can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74.

Various considerations "may bear on the reasonableness or unreasonableness of the force used," including the "relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," among others. *See id.* at 2473. Moreover, to offend substantive due process and thereby be objectively unreasonable, the force used must shock the conscience. *Cty. of Sacramento*, 523 U.S. at 846 (collecting cases); *see also Dancy*, 843 F.3d at 117–18 (due process objective reasonableness is not defined by negligence "because the Constitution 'does not guarantee due care on the part of state officials' [as] only 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level'" (quoting *Cty. of Sacramento*, 523 U.S. at 848–49)). Conduct that shocks the conscience is conduct that is so brutal and offensive that does "not comport with traditional ideas of fair play and decency." *Cty. of*

*Sacramento*, 523 U.S. at 847 (quotation omitted).  This requirement flows from "the Supreme Court's admonition that 'executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to a . . . font of tort law.'"  *Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (quoting *Cty. of Sacramento*, 523 U.S. at 847 n.8).

### a.       The Staff Defendants

The AC adequately alleges that the Staff Defendants—Teams, Tucker, Conner, and McKelvey[11]—used excessive force on at least some plaintiffs sufficient to confer liability under § 1983.  For each Staff Defendant, at least some plaintiffs adequately allege that the defendant purposefully or knowingly used force that was objectively unreasonable and met the "shock the conscience" standard under the circumstances—which involved the application of force upon persons with developmental disabilities in residential care at the Union Avenue IRA.

As to Teams, the AC alleges, for example, that she "pulled D.K.'s hair and 'spit directly in her face[,]'" AC ¶ 98, 141; punched B.R., *id.* ¶ 132; and cut Z.O. on her toe, *id.* ¶ 130.  As to Tucker, the AC alleges that, on July 29, 2014, she "punched D.K. in the back and pushed her against a bathroom wall at the Union Avenue IRA[,]" which caused her to suffer a black eye, and subsequently failed to obtain medical care for D.K., *id.* ¶¶ 81–82, 97, 126, 142; and that on August 15, 2014, she pushed Z.O. in the shower, causing Z.O. to suffer a black eye, *id.* ¶¶ 84–86, 128, 145.  The AC does not allege similar conduct by Tucker against B.R.

As to Conner, the AC adequately alleges that she used excessive force against Z.O. and B.R., although not D.K.  The AC alleges that Conner beat and kicked Z.O., *id.* ¶ 129, once in the

---

[11] Defendants Linton and Goodwin are also categorized as Staff Defendants, but neither has moved to dismiss the AC.

legs "to the point where they swelled up like balloons," *id.* ¶ 106. And, on September 1, 2014, the AC alleges, Conner repeatedly kicked Z.O. *Id.* ¶¶ 119–20, 146. Similarly, Conner "hit, kicked, and punched B.R.," whom she did not "like" "because she shows off in front of her dad and drinks from everybody['s] cups and bottles." *Id.* ¶ 105. The AC does not allege similar conduct by Conner against D.K.

As to McKelvey, the AC adequately alleges that she used excessive force against D.K. but not against Z.O. and B.R. The AC alleges that, on August 5, 2014, McKelvey escorted D.K. to Lincoln Hospital in the Bronx for treatment for a black eye (caused when Tucker pushed D.K. against a bathroom wall on July 29, 2014, *id.* ¶¶ 81–82), and that, at Lincoln Hospital, McKelvey abused D.K. by speaking to her in a "verbally abusive manner" and because she "violently pushed" D.K and that she grabbed her and forcibly sat her in her seat. *Id.* ¶¶ 78–80, 143. The AC does not allege similar conduct by McKelvey against Z.O. or B.R.

This alleged conduct is enough for the persons subject to it to state an excessive force claim under § 1983. On the facts as pled, the unprovoked pushing, punching, and kicking of persons with developmental disabilities is clearly not objectively reasonable as a matter of law.

Nor, to the extent that the defendants invoke qualified immunity, is qualified immunity available to defendants for such conduct, based on the pleadings. Qualified immunity protects federal and state officials from money damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A state official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his [or her] shoes would have understood he [or she] was violating

27

it." *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation and alterations omitted). "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The purpose of qualified immunity is to "give[] government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City and Cty. of San Francisco*, 135 S. Ct. at 1774 (quotation and alterations omitted). Qualified immunity is "an affirmative defense on which the defendant officials bear the burden of proof[.]" *E.g.*, *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). "A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but the defense faces a formidable hurdle when advanced on such a motion and is usually not successful." *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) (quotation and alterations omitted).

The conduct alleged here does not implicate qualified immunity. As pled, the Staff Defendants cruelly abused persons with disabilities for no valid reason, but instead out of malice, spite, impatience, or sport. The evidence, of course, may or may not bear out the AC's claims. But on a motion to dismiss, the Court must take the well-pleaded allegations as true. Those allegations are that the Staff Defendants, wardens with a duty of care, engaged in unprovoked violence towards wards with disabilities. Such physical abuse of helpless persons cannot be said to serve a legitimate governmental interest in a civilized society; to bespeak a "mistaken but reasonable judgment" as to legality for which breathing room must be given; or to be sufficiently proportionate to the needs of the situation to be objectively reasonable under the circumstances. *See, e.g.*, *Dockery v. Barnett*, 167 F. Supp. 2d 597, 603–04 (S.D.N.Y. 2001) (school official who

force fed autistic students against their will, repeatedly grabbed the children with enough force to leave a hand print, a fingernail mark, a bruise, or to cause tears, and when the children suffered severe psychological injuries, treated the students with excessive force in violation of the due process clause); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 249–50 (2d Cir. 2001) (teacher not entitled to qualified immunity from student's due process claim when teacher, in response to the student's throwing of a dodge ball towards the teacher, grabbed the student by the throat, lifted him from the ground by his neck, dragged him across the gym floor, choked him, slammed his head into the bleachers four times, rammed his head into a metal fuse box on the gym wall, and punched him in the face). Nor do the alleged acts of abuse, as a matter of law, fall below a required level of severity. *Cf. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d at 172–73 ("We have never adopted a *per se* rule that a single slap from a teacher or other school official can never be sufficiently brutal to shock the conscience and invoke the protections of the due process clause.").

Accordingly, the AC states claims under § 1983 for excessive force against the movant Staff Defendants as follows: the claims against Teams brought by D.K., Z.O, and B.R.; the claims against Tucker brought by D.K. and Z.O.; and the claims against Conner brought by Z.O. and B.R.; and against McKelvey brought by D.K.

### b. The Supervisor Defendants, White, and Minter-Brooks

The AC also adequately alleges liability under § 1983 against each of the Supervisor Defendants—Gonzalez, Linder, and Peyton, along with White, and Minter-Brooks—by at least one plaintiff for the misconduct and/or abuse experienced at the Union Avenue IRA. The AC alleges that each defendant was personally involved either through direct participation in the alleged deprivations or though gross negligence or deliberate indifference. For present purposes,

the Court need mainly only address one such theory of personal involvement—deliberate indifference—to sustain plaintiffs' claims. As to each such defendant, the AC has adequately pled instances of the objectively reckless conduct necessary to establish deliberate indifference to the constitutional violations alleged, *see id.* ¶¶ 235–38.

As to Gonzalez, the AC adequately alleges liability to B.R. under § 1983 deliberate indifference principles. Gonzalez worked at the Union Avenue IRA as a Developmental Assistant 1, with responsibility for supervising other staff. AC ¶ 27. On May 17, 2014, when B.R. woke up with a black eye, Gonzalez was the supervisor on duty at the Union Avenue IRA. *Id.* ¶¶ 68–69. The AC alleges that Gonzalez covered up the fact that B.R. had a black eye by informing C.R. that she and other staff did not know what caused B.R.'s black eye, stating "We don't know. She [B.R.] woke up that way." *Id.* ¶ 69. Gonzalez also allegedly falsely told C.R. that B.R. had been examined by a doctor at Lincoln Hospital and that the doctor concluded the injury was "not bad," *id.* ¶ 70, whereas in fact, Gonzalez had directed that B.R. be removed from the hospital and brought back to the Union Avenue IRA before being seen by a doctor, explaining that the hospital was busy, *id.* ¶ 154. Gonzalez also did not report the black eye, which was reported to her by a Union Avenue IRA staff member who told Gonzalez that the black eye had been caused by a different Union Avenue IRA staff member who punched B.R. in the face when B.R. had coughed while that staff member was administering medication to B.R., *id.* ¶152; as alleged, Gonzalez dismissed the incident upon learning of it because there were "so many stories." and told staff who sought to report the incident "that she didn't want to 'hear any more about [B.R.'s] eye,'" *id.* ¶ 154. When the staff member who witnessed the punch that caused B.R.'s black eye reported the black eye to Gonzalez, Gonzalez told that staff member "not to worry and that 'nothing more was going to happen.'" *Id.* ¶ 153.

These allegations suffice to plead deliberate indifference to the conditions of excessive force B.R. experienced and caused her black eye. It was objectively reckless for Gonzalez to have B.R. removed from the hospital without treatment, and not to report the abuse of which she had been notified. Further, that Gonzalez did not "act on the[] report[] so as to prevent future occurrences" of constitutional violations fairly alleges "deliberate indifference to the [plaintiff's] rights by failing to act on information that unconstitutional acts were occurring." *Johnson*, 239 F.3d at 255. And, by explaining to the staff member who reported the punch to B.R. that "nothing more was going to happen," Gonzalez participated in the violation, and invited recurrence of such violations, sufficient for liability under § 1983. *See Okin v. Village of Cornwall-On-Hudson-Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009) ("The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence."). As such, the AC states a claim against Gonzalez by B.R. under § 1983 for violation of the due process clause.

As to Linder, the AC's allegations are sufficient to state a claim both of direct participation in, and deliberate indifference to, due process violations as to multiple plaintiffs. Linder worked at the Union Avenue IRA as a Developmental Assistant 2, with responsibility for managing and supervising staff. AC ¶ 28. The AC alleges direct participation in constitutional violations in that Linder "hit, kicked, and punched B.R." because B.R. "shows off in front of her dad and drinks from everybody['s] cups and bottles." *Id.* ¶ 105. Further, the AC alleges that, during D.K.'s visit to Lincoln Hospital on August 5, 2014, a week after she was pushed in the shower by Tucker, *see id.* ¶¶ 74–82, staff at Lincoln Hospital reported to Linder that defendant McKelvey had "spoke[n] to D.K. in a verbally aggressive manner and 'violently pushed'" her, conduct that state investigators later determined constituted abuse and neglect of D.K, *id.* ¶¶ 79–

80.  The AC alleges a similar failure to supervise on Linder's part, exhibiting a deliberate indifference to constitutional violations, with respect to B.R.  A Union Avenue IRA staff member reported to Linder and Peyton that Linton had punched B.R. in the face but that "nothing was done."  *Id.* ¶ 93.  Finally, Linder is alleged to have covered up, with Peyton, "everything that goes on in" the Union Avenue IRA, such as beatings of Z.O. by defendant Conner and Teams's and Tucker's cutting of Z.O.'s toe.  *Id.* ¶¶ 129–31.  As alleged, Linder thus knew of this physical abuse, had responsibility to address it, but recklessly—or worse—did not act to mitigate or should have known of and acted to do so.  *See, e.g.*, *Dockery*, 167 F. Supp. 2d at 605 (liability proper for constitutional violation when defendant received a report "from two classroom aides that one of the teachers in his school was being too physical with a class of autistic children.  In response, [defendant] took no action besides asking [the teacher] whether she had abused the children.").  These allegations are sufficient to state a claim for personal involvement on Linder's part, either through direct participation or through objectively reckless responses to serious constitutional violations sufficient to constitute deliberate indifference, as to all three of D.K., Z.O., and B.R.

As to Peyton, the allegations are sufficient to state a claim for liability to D.K., Z.O., and B.R.  Peyton worked as a Social Worker Assistant 3 at the Union Avenue IRA, responsible for managing and supervising other staff.  *Id.* ¶ 29.  The AC alleges that Peyton tried to cover up that D.K. had suffered a black eye when he contacted L.K. on August 5, 2014, to inform her of the discoloration around D.K.'s eyes, which Peyton claimed was caused by "allergies" or that D.K. might have been rubbing her eye due to discomfort.  *Id.* ¶ 74.  Peyton, with Linder, took no action in response to being told that B.R. had been punched in the face.  *Id.* ¶ 93.  And Peyton is alleged to have known of abuse of D.K. but to have "cover[ed] it up," *id.* ¶ 127, and, similarly,

with Linder, to have covered up abuse of Z.O., *id.* ¶¶ 129–31. These allegations adequately plead Peyton's personal involvement in constitutional violations or an excessive risk of constitutional violations against D.K., Z.O., and B.R., either through direct participation in the violation, an objectively reckless response to it, or deliberate indifference to it, manifested in Peyton's complete failure to respond in the face of risks of harm to wards about which Peyton knew and should have known.

As to White, the allegations are sufficient to plead her liability to D.K., Z.O., and B.R. White was Deputy Director of the Metro New York Developmental Disabilities State Operations (DDSO) Office, responsible for the developing and monitoring of OPWDD systems improvement, overseeing the provision of services to developmentally disabled people, managing recordkeeping, and promoting best practices at OPWDD facilities in the Bronx and Manhattan, including at the Union Avenue IRA. *Id.* ¶ 32. On August 20, 2014, an anonymous Union Avenue IRA staff member whistleblower wrote to White chronicling in disturbing detail the widespread abuse of residents by staff there. *Id.* ¶ 88. The letter stated that staff members, such as Tucker, Teams, Linton, Linder, Conner, and Goodwin, abused and beat residents and reported that Peyton and Linder knew about the abuse and the identities of the abusers but covered up the abuse. *Id.* ¶¶ 90–91. The letter detailed abuse suffered by all three plaintiffs in this case. For example, the letter stated that Linton had punched B.R. in the face, resulting in a black eye, and that, despite this incident's having being reported to Peyton and Linder, nothing was done in response. *Id.* ¶¶ 92–93. The letter also stated that, on August 5, 2014, Tucker had punched D.K in the back, causing her face to hit the wall and resulting in a black eye, and that Teams had pulled D.K.'s hair and spat in her face. *Id.* ¶¶ 97–98. And, the letter reported to White that "Conner kicked Z.O. 'in the legs to the point where they swelled up like balloons.'"

*Id.* ¶ 106.  As alleged, White took no action in response to this letter for more than three weeks, *id.* ¶ 110, while the abuse continued, such as on September 1, 2014, when Conner repeatedly kicked Z.O., causing bruises and swelling to her legs, *id.* ¶¶ 119–20.  State investigators later highlighted White's failure to act in response to the whistleblower's August 20, 2014 letter to him, noting "that the whistleblower 'had already written the anonymous letter to Deputy Director Joyce White and no action was taken to protect the individuals at Union Ave.'"  *Id.* ¶ 121.  These allegations of a lack of response to the reports of serious constitutional violations are enough to plead objective recklessness to these violations of the plaintiffs' rights sufficient for liability under § 1983 on a theory of deliberate indifference.  *See Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) (supervisor may be liable under § 1983 "for her failure to remedy a violation" after receiving post hoc notice of the violation when "the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it").

Finally, as to Minter-Brooks, the facts pleaded are sufficient to state a claim for liability on the theory that she exhibited objective recklessness in the face of reports of abuse at the Union Avenue IRA by taking woefully insufficient action.  Minter-Brooks was the Region 5 Director of OPWDD, responsible for the development and monitoring of OPWDD systems improvement, overseeing the provision of services to developmentally disabled people, managing record keeping, and promoting best practices at facilities in OPWDD facilities in New York City, including at the Union Avenue IRA.  *Id.* ¶ 33.  She "received numerous complaints about abuse, neglect, and mistreatment at the Union Avenue IRA over a period of several years[.]"  *Id.* ¶ 181.  On March 16, 2015, Minter-Brooks received a letter from the OPWDD Deputy Commissioner notifying her that the Metro New York DDSO Office, over which she had responsibility, was being placed on a status that reflected serious deficiencies in its operations.

*Id.* ¶ 184.  The letter stated that there were numerous problems that the local agency "has been unable to sustain compliance with applicable laws and regulations" and that it had received "eight 45 day letters," which are issued by inspectors from the OPWDD Division of Quality Improvement that note serious and persistent concerns with agency operations, "in the year between March 2014 and March 2015." *Id.* ¶ 185.  The letter to Minter-Brooks set forth eight areas of non-compliance with the relevant laws and regulations: "medical follow-up, medication administration, protective oversight, community inclusion, habilitative services, physical plant, staff training, and incident management." *Id.* ¶ 186.  Particularly significant here, "protective oversight" refers to protecting residents from physical abuse and neglect; "staff training" includes training staff not to abuse or neglect residents; and "incident management" means ensuring that potential abuse and neglect is reported, properly investigated, and, if substantiated, that appropriate discipline is administered. *Id.* ¶ 187.  The AC alleges that compliance in each of these areas was necessary to safeguard the health and safety of plaintiffs D.K., Z.O., and B.R., and that noncompliance with the officials' duties in these areas threatened future injury to each of them. *Id.* ¶¶ 188–89.  Indeed, the AC alleges that, in the months after Minter-Brooks received but did not act on reports of widespread violations at the facility, each of the three plaintiffs, D.K., Z.O., and B.R. suffered unexplained head wounds—a February 12, 2016 gash in the scalp for B.R.; a February 23, 2016 a laceration to Z.O.'s head caused by staff misconduct; and a March 9, 2016 gash in D.K.'s head. *Id.* ¶¶ 190–97.

The results of the inspections of the facility, as pled, reinforce the claim against Minter-Brooks based on theories of objective recklessness sufficient for deliberate indifference.  On May 17, 2016, state regulators inspected the Union Avenue IRA. *Id.* ¶ 212.  Letters to Minter-Brooks by OPWDD's Division of Quality Improvement afterwards reported that the Union

Avenue IRA "facility is not in compliance with the New York State regulatory requirements to operate an IRA." *Id.* The letter reported that 23 allegations of abuse, neglect, or mistreatment had been reported between September and December 2014 on the floor of the Union Avenue IRA in which D.K., Z.O., and B.R. reside, and that none of "the systemic concerns noted during the investigations of these allegations" appeared to have been addressed. *Id.* ¶ 214. On August 10, 2016, a return visit examined whether the facility "had achieved regulatory compliance through the effective implementation of plans of corrective action in response to the May 17, 2016 statement of deficiencies." *Id.* ¶ 216. The inspectors found to the contrary. On the floor of the Union Avenue IRA on which plaintiffs reside, they stated, "'serious and/or systemic deficiencies remain' in all of the areas cited in the previous inspection." *Id.* ¶ 217. Their letter warned that "[c]ontinued authorization of the program/service cannot be considered until we have verified that identified deficiencies have been corrected, and the agency is operating in compliance with applicable regulations." *Id.* ¶ 218. As alleged, the inspection further found that the Union Avenue IRA's review committee had "'failed to ensure that measures identified to prevent future and similar events' of abuse and neglect 'have been implemented. The agency failed to show evidence that recommendations stemming from investigations, including investigations of incidents classified as abuse or neglect, were implemented.'" *Id.* ¶ 220.

These well-pleaded allegations fairly plead actionable behavior by Minter-Brooks, who had responsibility for the Union Avenue IRA, was repeatedly informed of claims of abuse, but, as alleged, responded to them minimally if at all. The AC pleads objective recklessness on her part sufficient for deliberate indifference to the constitutional violations the plaintiffs had suffered or were at continuing risk to suffer at the Union Avenue IRA.

### 2.    Section 1983 Conspiracy

Plaintiffs also allege that the Staff Defendants, the Supervisor Defendants, and White and Minter-Brooks formed a conspiracy to deprive plaintiffs of their federal rights in violation of § 1983.[12]  Although the AC adequately alleges numerous abuses of plaintiffs' constitutional rights, it does not adequately allege the elements required for a § 1983 conspiracy.  The Court therefore limits the scope of plaintiffs' claims brought under § 1983 to exclude claims based on a conspiracy by defendants to violate their federal rights.[13]

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  And, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his [or her] constitutional rights are properly dismissed and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quotation omitted).  Allegations of direct evidence of conspiracy are not necessary, as conspiracies have long been recognized to be secretive by nature and often are proven by circumstantial evidence, *Pangburn*, 292 F.3d at 72,

---

[12] The AC purports to limit its conspiracy claim to "the Staff Defendants and Supervisor Defendants," AC ¶ 230, but because the allegations of a § 1983 conspiracy appear within the First Cause of Action, under which plaintiffs assert all their § 1983 claims and which is pleaded against the Staff Defendants, the Supervisor Defendants, *and* defendants White and Minter-Brooks in their individual capacities, *id.* ¶ 224 ("First Cause of Action"), the Court construes the § 1983 conspiracy claim to be asserted against those defendants as well.

[13] Plaintiffs allege that the conspiracy deprived them of their rights secured by the Fourth Amendment, *see* AC ¶ 230.  But, plaintiffs also broadly allege their § 1983 claims as arising under the "Fourth/Fourteenth Amendments," *id.* ¶ 224 ("First Cause of Action").  The Court therefore construes plaintiffs to be bringing their civil conspiracy claim under rights available to them under either amendment.

though detailed allegations of the conspiracy's time and place are helpful to cross the plausibility threshold, *Ciambriello*, 292 F.3d at 325. "For claims of § 1983 . . . conspiracies to survive a motion to dismiss, the plaintiff must provide some factual basis supporting a meeting of the minds." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533 (S.D.N.Y. 2013) (quotation omitted).

Here, the AC does not adequately state a claim of conspiracy to deprive plaintiffs of their federal rights because it does not adequately allege that defendants agreed or had a meeting of the minds to deprive the plaintiffs of such rights. While plaintiffs adequately plead numerous deprivations of their federal rights by individual defendants sufficient to state liability under § 1983, their claims of concerted conduct are more sparse, and are essentially limited to particular incidents of abuse in which multiple persons participated. But the AC does not go beyond that to support its claim of a broad conspiracy. It does not adequately allege, for example, that Staff Defendants coordinated with one other to deprive the plaintiffs of their rights, or that such defendants had an understanding with Supervisor Defendants that Supervisor Defendants would cover up the Staff Defendants' abuses. Plaintiffs effectively ask the Court to infer a sweeping conspiracy to violate their rights from allegations that there were widespread abuses. The AC does not, however, contain the sorts of allegations—for example, of inter-defendant meetings or communications or parallel or concerted behavior—that might tend circumstantially to evidence a wide conspiracy.

Accordingly, while the Court otherwise sustains plaintiffs' claims under § 1983, it must dismiss the portion of that claim based on a conspiracy among defendants to deprive them of their federal rights.

### E.     Tort Claims Brought Under State Law

Plaintiffs bring several state-law tort claims. Three are for intentional torts, against the Staff Defendants and defendant Linder: for assault, AC ¶¶ 239–42; battery, *id.* ¶¶ 243–46; and intentional infliction of emotional distress, *id.* ¶¶ 247–51. Plaintiffs also bring a claim for negligence, against the Supervisor Defendants and White and Minter-Brooks in their individual capacities, *id.* ¶¶ 252–56. The Court addresses these in turn.

### 1.     Assault and Battery

Plaintiffs adequately plead claims for civil assault and civil battery against the Staff Defendants—Teams, Tucker, Conner, and McKelvey—and Linder. "Under New York law, 'an "assault" is an intentional placing of another person in fear of imminent harmful or offensive contact. A "battery" is an intentional wrongful physical contact with another person without consent.'" *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993)); *see also Charkhy v. Altman*, 252 A.D.2d 413, 414 (N.Y. App. Div. 1st Dep't 1998) (same). Further, "[i]n the civil context, the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." *Girden*, 262 F.3d at 203. (quoting *United Nat'l Ins. Co.*, 994 F.2d at 108).

The AC's well-pled allegations state claims for assault and for battery. As to Teams, the AC alleges that she pulled D.K's hair and spit in her face, AC ¶ 98, cut Z.O. in the toe, *id.* ¶ 130, and punched B.R., *id.* ¶ 132. These claims support claims for assault and battery against D.K., Z.O., and B.R. As to Tucker, the AC alleges that she punched D.K. in the back and pushed her against a bathroom wall, causing her a black eye, *id.* ¶ 81,[14] and that she pushed Z.O. in the

---

[14] Although the AC is silent as to whether D.K. saw Tucker punch her in the back or otherwise was aware of the imminent harmful or offensive contact sufficient for an apprehension of it, as is required for assault, on a motion to dismiss, the Court, drawing all reasonable inferences from

shower, causing Z.O. a black eye, *id.* ¶¶ 84–86, 128, 145.  It also alleges that Tucker, with

Teams, ordered Z.O. and B.R. "to wait nude on their beds to be showered 'and that they would

comply out of fear,'" and that they would use cold water to bathe D.K. and Z.O.  *Id.* ¶ 144.

These allegations state claims by D.K., Z.O., and B.R. against Tucker for assault and battery.

As to Conner, the AC alleges that Conner beat and kicked Z.O., *id.* ¶ 129, once in the

legs "to the point where they swelled up like balloons," *id.* ¶ 106.  And, on September 1, 2014,

the AC alleges, Conner repeatedly kicked Z.O.  *Id.* ¶¶ 119–20, 146.  Similarly, Conner "hit,

kicked, and punched B.R.," whom she allegedly disliked.  *Id.* ¶ 105.  The AC does not allege

similar conduct by Conner against D.K.  As such, Z.O. and B.R., but not D.K., state claims for

assault and for battery against Conner.

As to McKelvey, the AC adequately states claims for assault and battery against D.K. but

not against Z.O. or B.R.  It alleges that, on August 5, 2014, McKelvey escorted D.K. to Lincoln

Hospital in the Bronx for treatment for a black eye (caused when Tucker pushed D.K. against a

bathroom wall on July 29, 2014, *id.* ¶¶ 81–82), and that, at Lincoln Hospital, McKelvey abused

D.K. by speaking to her in a "verbally abusive manner" and because she "violently pushed" D.K

and that she grabbed her and forcibly sat her in her seat.  *Id.* ¶¶ 78–80, 143.  The AC does not

allege similar conduct by McKelvey against Z.O. or B.R.

Finally, as to Linder, the AC states a claim for assault and for battery against B.R. but not

D.K. and Z.O.  Linder "hit, kicked, and punched B.R." because B.R. "shows off in front of her

dad and drinks from everybody['s] cups and bottles."  *Id.* ¶ 105.  But it does not allege conduct

to state such a claim for assault or battery against D.K. and Z.O.

---

the allegations in plaintiffs' favor, concludes that these allegations regarding the punch and push
adequately plead that element of assault.

Accordingly, the AC states claims for assault and for battery against each of the Staff Defendants and Linder by at least one plaintiff.

### 2.     Intentional Infliction of Emotional Distress

The Court sustains plaintiffs' claim for intentional infliction of emotional distress. Under New York law, that tort has four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citation omitted). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Id.* (citation omitted).

The Court need not parse the AC's allegations beyond those pleading the elements of assault and battery in order to sustain the claims for intentional infliction of emotional distress. On the pleadings, the conduct alleged, as recounted above, is sufficiently extreme, given its nature and particularly given the vulnerability of the allegedly victims, so as to adequately allege this tort.

Accordingly, the Court sustains this claim by each plaintiff against those defendants as to whom the Court sustained that plaintiff's claims for assault and battery.

### 3.     Negligence

Plaintiffs also bring claims for negligence against the Supervisor Defendants—Gonzalez, Linder, and Peyton, and against White and Minter-Brooks in their individual capacities. Plaintiffs allege that these defendants were negligent in their "hiring, supervision, training, discipline, and retention of staff at the Union Avenue IRA." AC ¶ 254. The Court sustains these claims.

Under New York law, negligence requires a plaintiff to establish "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 535 (N.Y. 1981)).

The AC's allegations support a negligence claim against the Supervisor Defendants and White and Minter-Brooks.[15] These defendants are alleged to have responsibility for supervising other staff and to have owed plaintiffs a duty of care. That duty may be breached by a defendant who knew or should have known about others' misconduct or propensity to commit misconduct and failed to undertake adequate measures to prevent it. *JG & PG ex rel. JGIII v. Card*, No. 08 Civ. 5668 (KMW), 2009 WL 2986640, at *10 (S.D.N.Y. Sep. 17, 2009). As reflected above, the AC alleges numerous instances and indications of misconduct by persons under the supervision of these defendants and of their failure to adequately respond, resulted in injury to plaintiffs. The Court sustains the claims for negligence against these defendants.

## F.      Claims for Housing Discrimination Brought Under Federal and State Law

Plaintiffs bring claims against the Staff Defendants and Linder for violations of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, *id.* ¶¶ 257–62; the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.*, *id.* ¶¶ 263–68; and the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(2), AC ¶¶ 269– 72. Because liability under the state and New

---

[15] Plaintiffs sue Linder for the three intentional torts and for negligence, potentially running afoul of the rule that a defendant cannot be liable for an intentional tort and negligence based on the same conduct, *see Mazzaferro v. Albany Motel Enters., Inc.*, 127 A.D.2d 374, 376 (N.Y. App. Div. 3d Dep't 1987) ("New York has adopted the prevailing modern view that, once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.") However, at the pleading stage, the Court will permit plaintiffs to maintain both claims against her as alternative theories, pending discovery into these events. *See Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 88 n.14 (E.D.N.Y. 2012).

York City statutes, in pertinent part, tracks liability under the FHA, the Court considers these together, and holds that the AC states claims for violations of these statutes.

The FHA, enacted as Title VIII of the Civil Rights Act of 1968, makes it unlawful to discriminate against any person "in the provision of services or facilities in connection with [a] dwelling[] because of a" disability. 42 U.S.C. § 3604(f)(2). "[D]iscrimination" is defined to include "a refusal to make reasonable accommodations in rules, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" *Id.* § 3604(f)(3)(B).

It appears an open question in the Second Circuit whether § 3604 of the FHA proscribes discrimination after a plaintiff acquires housing. The Second Circuit has assumed but not decided so in one context. *See Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d Cir. 2008) (summary order) ("[a]ssuming, without deciding, that a plaintiff may state an FHA claim of discrimination against families with children based on a hostile housing environment theory"). Other circuits appear to have taken different views on whether the hostile housing environment must reach the level of a constructive eviction to state such a claim. *Compare, e.g.*, *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) ("§ 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction") *with, e.g.*, *The Comm. Concerning Cmty Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009) ("the FHA[,]" including § 3604, "reaches post-acquisition discrimination" even when such discrimination does not amount to constructive eviction). District courts in this circuit have read § 3604 to "prohibit the creation of a 'hostile environment' by individuals who have control or authority over the 'terms, conditions, or privileges of sale or rental of a dwelling,' similar to the prohibition imposed by Title VII against

the creation of a hostile work environment." *Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 428 (E.D.N.Y. 2015) (emphasis omitted) (quoting *Cain v. Rambert*, No. 13 Civ. 5807 (MKB), 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014)); *see also Anonymous v. Goddard Riverside Cmty. Ctr., Inc.*, No. 96 Civ. 9198 (SAS), 1997 WL 475165, at *4 (S.D.N.Y. July 18, 1997) (applying standards required for Title VII sexual harassment employment discrimination claims based on hostile work environment theory to a hostile environment claim under FHA § 3604).

The Court declines to dismiss the FHA claims at this stage. The Court's assessment at this point is that § 3605(f)(2)'s proscription of discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or *in the provision of services or facilities in connection with such dwelling*, because of a handicap," 42 U.S.C. § 3604(f)(2) (emphasis added), includes discrimination against people with disabilities after their acquisition of housing that need not rise to the level of a constructive eviction. As noted, § 3604(f)(3)(B) defines "discrimination" to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(C). These provisions appear to reach discrimination in the provision of services following the acquisition of housing on the basis of disability.

The Court will apply here the substantive standard used in the Title VII context, as other district courts in the Second Circuit have done. *See, e.g.*, *Goddard Riverside Cmty. Ctr., Inc.*, 1997 WL 475165, at *4. As such, plaintiffs "seeking to establish a hostile housing environment claim must establish that (1) [he or] she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile [housing] environment, (2) the harassment was

44

because of the plaintiff's membership in a protected class, and (3) a basis exists for imputing the allegedly harassing conduct to the defendants." *Cain*, 2014 WL 2440596, at *5 (second alteration in original; quotations and citations omitted). There must be a relationship between the discriminatory conduct and housing. *Id.*

Measured against these standards, plaintiffs have stated a claim for housing discrimination under the FHA. As noted, the Staff Defendants and Linder are alleged to have engaged in conduct that constitutes discrimination against plaintiffs on the basis of their status as people with developmental disabilities. And these defendants, as staff members at the Union Avenue IRA, were responsible for the operation and provision of housing services at the Union Avenue IRA. This discrimination, as alleged, was sufficiently pervasive and severe to result in a hostile housing environment at the Union Avenue IRA, and was undertaken against residents with disabilities because of their disabilities. And because the New York State Human Rights Law and the New York City Human Rights Law provide as much as broad (and, as to the New York City Human Rights Law, even broader) protection to disabled individuals than federal law, the Court sustains these state and city law claims. *See Peters v. Baldwin Union Free School Dist.*, 320 F.3d 164, 169 (2d Cir. 2003); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (New York City Human Rights Law is a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the City's Human Rights law cannot fall") (emphasis and quotation omitted).

As such, the Court declines the motion to dismiss plaintiffs' FHA, New York State Human Rights Law, and New York City Human Rights Law claims at this stage.

**G.    Claims Brought Under the Rehabilitation Act and the Americans with Disabilities Act**

Finally, plaintiffs bring claims under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, AC ¶¶ 273–79, and for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, AC ¶¶ 280–85.  These claims are brought against the OPWDD Defendants; the Rehabilitation Act claims are also brought against the White and Minter-Brooks in their official capacities for damages and, with Delany, for injunctive relief, *id.* ¶¶ 2, 4 (Prayer for Relief).  The ADA claim is brought against the OPWDD Defendants in their official capacities for injunctive relief only, *id.* ¶ 4 (Prayer for Relief).  The Court denies the motion to dismiss these claims.

The Rehabilitation Act was enacted before the ADA.  Its focus is narrower than the ADA's.  Its provisions apply only to programs that receive federal financial assistance.  Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."  29 U.S.C. § 794(a).  Nonetheless, both the Rehabilitation Act and Title II of the ADA have generally equivalent requirements for claims, such that claims under those statutes are analyzed together.  *Dean v. Univ. at Buffalo Sch. of Med. and Biomedical Sciences*, 804 F.3d 178, 187 (2d Cir. 2015) (citing *Harris v. Mills*, 572 F.3d 66, 73–74 (2d Cir. 2009)).  As such, to establish a *prima facie* violation of either statute, a plaintiff must show "(1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability."  *Powell v. Nat. Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004) (alterations omitted) (citing *Henrietta D.*, 331 F.3d at 272).

Plaintiffs sue the OPWDD defendants for injunctive relief under both statutes. To support such a claim, plaintiffs must plead a violation of each statute and that they will suffer real, imminent, and irreparable harm absent a remedy. *Henrietta D.*, 331 F.3d at 290. Claims for injunctive relief do not require a showing of discriminatory animus. *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).

The AC states claims under § 504 of the Rehabilitation Act and Title II of the ADA for injunctive relief. It alleges that plaintiffs are qualifying individuals with disabilities within the meaning of the statutes. AC ¶¶ 275, 282. The OPWDD Defendants are alleged to be charged with ensuring that the programs and activities conducted at the Union Avenue IRA in conformity with § 504 of the Rehabilitation Act and Title II of the ADA. *Id.* ¶¶ 276, 283. As to the Rehabilitation Act, plaintiffs further allege that OPWDD and the Metro New York DDSO Office received federal financial assistance to operate programs and activities at the Union Avenue IRA. *Id.* ¶ 274. Finally, the AC adequately alleges—as reviewed above—that they were discriminated against or denied the opportunity to benefit from services, programs, or activities for which the OPWDD Defendants had responsibility, *id.* ¶¶ 32–34. Accordingly, the Court denies the motion to dismiss plaintiffs' claims under these two statutes for injunctive relief.

Plaintiffs also sue White and Minter-Brooks, in their official capacities, for compensatory damages under § 504 of the Rehabilitation Act. *Id.* ¶ 2 (Prayer for Relief). As addressed above, these claims are properly brought consistent with the Eleventh Amendment. Substantively, "to recover monetary damages under the Rehabilitation Act . . . plaintiff would need to show that any violation resulted from 'deliberate indifference' to the rights the disabled enjoy under the Act." *Powell*, 364 F.3d at 89 (citation omitted). For the reasons reviewed above in connection with the § 1983 claims, the AC adequately pleads deliberate indifference by White and Minter-

Brooks to deprivations of plaintiffs' federal rights. The Court therefore denies the motion to dismiss this claim against White and Minter-Brooks.

Accordingly, the Court declines to dismiss the claims against the OPWDD Defendants for violations of § 504 of the Rehabilitation Act and Title II of the ADA seeking injunctive relief, and the claim for compensatory damages under § 504 of the Rehabilitation Act against White and Minter-Brooks in their official capacities.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motions to dismiss, while narrowing the scope of plaintiffs' § 1983 claim to eliminate a theory of liability based on conspiracy to violate plaintiffs' federal rights.

The Clerk of Court is respectfully directed to terminate all motions currently pending in this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 5, 2017
New York, New York